IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

|  |  |
|---|---|
| BRANDON BERNARD, | ) CIVIL ACTION<br>) (Capital Habeas Corpus)<br>) |
| Petitioner, | ) Case No.: 2:20-cv-616<br>) |
| v. | ) **\*CAPITAL CASE\***<br>) **EXECUTION SCHEDULED FOR** |
| T.J. WATSON, Warden, Federal<br>Correctional Complex (FCC) Terre<br>Haute, | ) **DECEMBER 10, 2020**<br>)<br>)<br>) |
| Respondents. | ) |

_____

**PETITION FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2241**
_____

**ROBERT C. OWEN**
Law Office of Robert C. Owen, LLC
53 W. Jackson Blvd., Ste. 1056
Chicago, Illinois 60604
Phone: (512) 577-8329
Email: robowenlaw@gmail.com
Texas Bar No.: 15371950

**JOHN R. CARPENTER**
Assistant Federal Public Defender
Federal Public Defender for the
Western District of Washington
1331 Broadway, Suite 400
Tacoma, Washington 98402
Phone: 253.593.6710
Email: john_carpenter@fd.org
Washington Bar No.: 23301

Counsel for Petitioner

**PRELIMINARY STATEMENT**

Brandon Bernard, an indigent death-sentenced federal prisoner, brings this petition because governmental misconduct prevented him from litigating *Brady* and *Napue* claims under 28 U.S.C. § 2255 in his sentencing district. Specifically, throughout Mr. Bernard's trial and original § 2255 review process, the government hid an expert opinion of a law enforcement officer that directly contradicted its theory for why Mr. Bernard deserved a death sentence. After Mr. Bernard first discovered in 2018 that the government had long been suppressing this evidence, he diligently sought to bring the merits of his claims before his sentencing court. Ultimately, he was prevented from doing so because the Fifth Circuit ruled that his motion was not allowed under § 2255(h) because the government's misconduct only implicated his sentence of death, as opposed to his guilt for the underlying offense. Because § 2255 has proven to be an inadequate vehicle to prevent an unjust execution, Bernard files this 28 U.S.C. § 2241 petition.

Pursuant to Local Criminal Rule 38-2(c) the following documents are included at the end of this document or in the Appendix filed with this Petition: (i) a listing of all legal actions, with docket numbers, filed in any court challenging the conviction and sentence challenged in the current petition; and (ii) a copy of, or a citation to, each court opinion, memorandum, decision, order, transcript of oral statement of reasons, or judgment involving an issue presented in the petition. Petitioner has also included in the Appendix copies of the cited pages to the appellate record in *United States v. Bernard*, No. 19-70021 (5th Cir.). We will cite pages from the Appendix as App_[Appendix page number].

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... i

Table of Authorities ......................................................................................... iv

I.    INTRODUCTION ..................................................................................... 1

II.   PROCEDURAL HISTORY ........................................................................ 5

III.  STATEMENT OF FACTS ......................................................................... 9

      A.   Introduction .................................................................................. 9

      B.   In 2018, the long-suppressed expert opinion of former Sgt. Sandra Hunt
           surfaced for the first time. ....................................................... 10

      C.   Sgt. Hunt's expert opinion was suppressed by the government. ....... 12

      D.   To support its arguments in favor of a death sentence for Mr. Bernard, the
           government presented evidence that directly conflicted with the expert
           opinion that it had suppressed. ................................................ 13

IV.   BERNARD'S DEATH SENTENCE WAS OBTAINED IN VIOLATION OF
      THE CONSTITUTION AND SHOULD BE REVERSED. ................................ 15

      A.   The government violated *Brady* and *Napue*, requiring reversal of Bernard's
           death sentence. ........................................................................ 15

      B.   The government's responses to date only confirm that it violated *Brady* and
           *Napue*, requiring reversal of Bernard's death sentence. ............... 21

           1.   The government's contentions about what was or wasn't disclosed
                ignore that the record clearly shows it knew in 1999 about Sgt. Hunt's
                expert opinion and failed to disclose that opinion to the defense. .... 21

           2.   The government's contentions about the materiality of Sgt. Hunt's
                opinion rely on misleading descriptions of the evidence and are
                contrary to the government's position at trial, which relied heavily on
                tying Bernard tightly to the Bloods. .......................................... 24

V.    THIS COURT HAS JURISDICTION TO CONSIDER BERNARD'S CLAIM
      UNDER 28 U.S.C. §§ 2255(E) AND 2241 .............................................. 28

VI.   PRAYER FOR RELIEF. ......................................................................... 36

STATEMENT IN COMPLIANCE WITH LOCAL CRIMINAL RULE 38-2(c): ............. 37

SUPPLEMENTAL STATEMENT OF ISSUES RAISED IN PRIOR PROCEEDINGS...39

CERTIFICATE OF SERVICE.............................................................................................42

APPENDIX

# TABLE OF AUTHORITIES

## Cases Cited:

*Banks v. Dretke*,
    540 U.S. 668 (2004) ......................................................................... 32

*Boss v. Pierce*,
    263 F.3d 734 (7th Cir. 2001) ............................................................ 27

*Bourgeois v. Watson*,
    977 F.3d 620 (7th Cir. 2020) ......................................... 29, 30, 31, 34

*Brady v. Maryland*,
    373 U.S. 83 (1963) ........................................................................... 1

*Brown v. Caraway*,
    719 F.3d 583 (7th Cir. 2013) ............................................................ 29

*Douglas v. Workman*,
    560 F.3d 1156 (10th Cir. 2009) ........................................................ 35

*In re Bernard, No. 19-50837*,
    826 F. App'x 356 (5th Cir. Sept. 9, 2020) .................................. 4, 8, 33

*Bernard v. United States*,
    539 U.S. 928 (2003) ........................................................................... 6

*Kyles v. Whitley*,
    514 U.S. 419 (1995) ............................................................. 16, 23, 25

*Lee v. Watson*,
    964 F.3d 663 (7th Cir. 2020) ..................................................... 29, 34

*Miller v. Alabama*,
    567 U.S. 460 (2012) ......................................................................... 10

*Napue v. Illinois*,
    360 U.S. 264 (1959) ..................................................................... 2, 16

*Panetti v. Quarterman*,
    551 U.S. 930 (2007) ..................................................................... 7, 35

*Purkey v. United States*,
    964 F.3d 603 (7th Cir. 2020) ..................................................... *passim*

*Scott v. United States*,
    890 F.3d 1239 (11th Cir. 2018) ............................................................ 35

*Skipper v. South Carolina*,
    476 U.S. 1 (1986) ................................................................................. 27

*Sparks v. United States, No. W-99-CR-070-3*,
    2018 WL 1415775 (W.D. Tex., March 19, 2018) ......................... 10, 18

*Strickler v. Greene*,
    527 U.S. 263 (1999) ............................................................................. 32

*United States v. Agurs*,
    427 U.S. 97 (1976) ............................................................................... 31

*United States v. Bagley*,
    473 U.S. 667 (1985) ............................................................................. 16

*United States v. Bernard*,
    299 F.3d 467 (5th Cir. 2002) ............................................................ 6, 19

*United States v. Bernard*,
    762 F.3d 467 (5th Cir. 2014) ................................................................. 6

*United States v. Bernard*,
    820 F. App'x 309 (5th Cir. 2020) ................................................. 4, 8, 33

*Vialva v. Watson*,
    975 F.3d 664 (7th Cir. 2020) .......................................................... 29, 32

*Webster v. Daniels*,
    784 F.3d 1123 (7th Cir. 2015) (en banc) ............................................. 32

*Youngblood v. West Virginia*,
    547 U.S. 867 (2006) ............................................................................. 16

## Statutes:

18 U.S.C. § 1111 ......................................................................................... 9

18 U.S.C. § 1117 ......................................................................................... 9

18 U.S.C. § 2119 ......................................................................................... 9

28 U.S.C. § 2241 ................................................................................. *passim*

28 U.S.C. § 2255 ................................................................................. *passim*

**Other:**

Local Criminal Rule 38-2 .................................................................. i, 5, 37

Fed. R. Civ. P. Rule 60 ................................................................. 4, 6, 7, 8

United States Constitution, Art. I, § 9, cl. 2 ........................................... 7

**I.    INTRODUCTION**[1]

Brandon Bernard faces execution on December 10, 2020, as a result of constitutional violations by the United States government. In this Petition, Mr. Bernard establishes that the government hid *Brady*[2] material not only during the trial, but also throughout the entire § 2255 collateral review process, thoroughly corrupting all stages of the proceedings. The evidence the government suppressed was the opinion of its law enforcement expert that was favorable to Mr. Bernard. The favorable opinion was that Mr. Bernard was at the very periphery of a gang in which the government contended Mr. Bernard was completely immersed. The suppressed opinion was of critical importance because the government, in urging the jury to impose a death sentence, argued that Bernard's strong connection to the gang meant that he would remain dangerous for years

---

[1] This Introduction is essentially identical to that set forth in Bernard's Motion for Stay of Execution, except for the omission of those parts relevant only to the issue whether a stay should be issued.

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

to come if not executed.[3] The government also committed *Napue*[4] violations relating to that *Brady* material, presenting false testimony directly contradicted by its own expert's opinion. Had jurors been aware of the suppressed expert opinion testimony, they would not have returned any death verdict[5] (even without this information, they spared Mr. Bernard's life on two of the three capital counts). As a result, Mr. Bernard's death sentence was obtained in violation of the Constitution.

---

[3] The government's predictions of future dangerousness have proven utterly false. Contrary to the government's arguments for death, Bernard has not been active in any gang. Instead, he has been a model prisoner. Mark Bezy, formerly the warden at the very institution where Bernard is now incarcerated, reviewed Bernard's BOP file. Bezy noted that Bernard has been allowed to work as an orderly, which reflects prison officials' confidence in his trustworthiness and good behavior, and that Bernard remarkably had not incurred a single disciplinary infraction during his time in the BOP (then 16 years). *See* App_676-682 (Clemency Petition at 20-26); App_856 (Clemency Petition at 204-205; Declaration of Warden Mark Bezy (Ret'd) at 2 (August 20, 2016)). In fact, beyond simply staying out of trouble, Bernard has used his time constructively, counseling other youth not to be led astray. App_707-712, 974-979 (Clemency Petition at 51-56; *id*. at 323-328 (Declarations of David and Michael Boyd and accompanying magazine article documenting Bernard's good works while in prison)).

[4] *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

[5] This is not idle speculation. The jury spared Mr. Bernard's life on two of three death-eligible counts even without being allowed to consider the suppressed evidence and after having been misled about the true facts by the government. And a majority of the surviving jurors have declared that they no longer believe a death sentence necessary given Mr. Bernard's lesser role in the crime, four of them urging outright that his death sentence be commuted. The presiding juror is praying that the President spares Mr. Bernard's life, and three other jurors have expressed similar views. As set forth in Mr. Bernard's Clemency Petition (attached as App_652-985, Exhibit 1 to Motion to Enjoin the Government from Executing Brandon Bernard until Appeals Are Complete, *United States v. Bernard*, No. W-99-CR-0070-ADA-2 (November 13, 2020)), there are plentiful reasons to commute Mr. Bernard's death sentence under principles of simple fairness. While this Clemency Petition does not bear directly on the legal questions before this Court, its content nevertheless shows that the relief Bernard requests is not only legally correct, but just.

As noted, the government continued to hide this *Brady* material during the entirety of the § 2255 proceeding. The government did this by falsely representing to the district court, during the pendency of Bernard's initial § 2255 proceeding, that it had maintained an open file policy prior to and during trial, suggesting that any and all *Brady* evidence would therefore have been disclosed. It also failed to correct the representation it had made to that same court, prior to trial, that it would disclose all *Brady* material.[6] As it turns out, no such open file policy meaningfully existed, as the government never disclosed the expert opinion of the law enforcement officer to any member of Bernard's defense team. On the contrary, Bernard's post-conviction review attorneys independently discovered the suppressed opinion by scouring the 2018 resentencing record of codefendant Tony Sparks. The government publicly revealed the long-suppressed expert opinion for the first time in 2018 because it supported a harsh sentence for Sparks, as the expert opined that Sparks occupied a position of great power within the gang, while Bernard did not. By the time Mr. Bernard made this discovery, however, the Fifth Circuit had denied his initial § 2255 motion.

No court has ever considered the merits of his *Brady/Napue* claims. The court that ruled on Mr. Bernard's initial § 2255 petition could not consider them, because the government unconstitutionally kept the underlying facts under wraps throughout the trial and the initial collateral review process. Once Mr. Bernard learned of the government's

---

[6] *See* Government's Response to Defendant's Motion to Discover Transcripts of Grand Jury Testimony and for Extension of Time to File Motion to Quash Indictment at 1, *United States v. Bernard*, No. W-99-CR-070 (W.D. Tex., July 29, 1999), dkt. 32. App_1.

violations, he diligently pursued the issue, filing a second-in-time § 2255 petition. But because the government hid its constitutional violations until after proceedings on Mr. Bernard's first § 2255 were complete, the Fifth Circuit deemed his claims successive, requiring authorization under § 2255(h), which it ruled was categorically inapplicable to sentencing claims not based on new and retroactive legal developments.[7]

Habeas review being unavailable to Mr. Bernard under § 2255, he now seeks review of his meritorious claims before this Court under § 2241. *See* 28 U.S.C. § 2255(e) (federal habeas petitioner is entitled to review under § 2241 when § 2255 is "inadequate or ineffective to test the legality" of his detention or sentence). The government's false representations to the court that all exculpatory evidence would have been disclosed through an open file discovery policy rendered his original § 2255 motion an inadequate vehicle to test the legality of his sentence.

Given the fact–intensive nature of his *Brady/Napue* claims, Mr. Bernard is also filing with the Court a separate motion for an evidentiary hearing, at which he would have the opportunity to prove any of the factual allegations herein that the government disputes.

---

[7] *United States v. Bernard*, 820 F. App'x 309 (5th Cir. 2020) (finding petition to be successive and not properly considered as Rule 60(b) motion); *In re Bernard*, No. 19-50837, 826 F. App'x 356 (5th Cir. Sept. 9, 2020) (declining to authorize successive petition); see also Order on Motion for Relief from Judgment at 4, *United States v. Bernard*, No. W-99-CR-070(2)-ADA (W.D. Tex. August 8, 2019), dkt. 664 (district court order finding Brandon's claim compelling, but not supported by Fifth Circuit precedent).

## II.    PROCEDURAL HISTORY[8]

Brandon Bernard is currently confined at United States Penitentiary Terre Haute, 4700 Bureau Road South, Terre Haute, Indiana 47802, under Bureau of Prisons Registration Number 91908-080. He is serving a sentence of life imprisonment without the possibility of parole and is also under a sentence of death, with execution currently set for December 10, 2020. He was convicted in the United States District Court for the Western District of Texas, Waco Division, in case number W-99-CR-070(2). He was sentenced on June 16, 2000. He is challenging the imposition of a sentence of death.

In May 2000, Mr. Bernard, along with codefendant Christopher Vialva, was convicted of capital murder in the killing of Todd and Stacie Bagley. The case was tried in the Western District of Texas before Judge Walter S. Smith, Jr. The facts of the crime, which ended with the senseless killing of two good Samaritans, are tragic. But while the facts of the crime are horrible, the prosecution's case for death, at least for Mr. Bernard, was anything but open-and-shut: jurors spared Mr. Bernard's life on two of three death-eligible counts, while sentencing Mr. Vialva – repeatedly identified by the government as the ringleader in the offense[9] – to death on all three. Mr. Bernard – who was not even

---

[8] In this Statement of Proceedings and the following sections of this Petition, Bernard sets forth all items requested under AO 242 (Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241). Some of the details of proceedings, and the information required under Local Criminal Rule 38-2(c), are included at the end of this pleading. What follows above is a brief summary of the proceedings.

[9] *See, e.g.*, App_651, Brief for the United States in Opposition to Petition for a Writ of Certiorari and to Application for a Stay of Execution, *Vialva v. United States*, Nos. 20-5766 and 20A49 (United States Supreme Court, September 22, 2020), at 26.

present when the Bagleys were abducted and robbed – was sentenced to death for aiding Vialva in the murder of Stacie Bagley.[10]

The judgment was affirmed on appeal. *United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002). The issues raised are provided in a list at the end of this pleading; they did not include the *Brady/Napue* violations he raises here; he was unaware of the instant claims because the government unconstitutionally hid their factual underpinnings throughout his trial. Bernard sought certiorari from his direct appeal; review was denied on June 16, 2003. *Bernard v. United States*, 539 U.S. 928 (2003).

In 2004, Mr. Bernard sought relief under 28 U.S.C. § 2255. The district court eventually denied the petition without an evidentiary hearing, after taking no action for seven years, and refused permission to appeal. The Fifth Circuit did likewise. *United States v. Bernard*, 762 F.3d 467 (5th Cir. 2014) (denying certificate of appealability), *cert. denied*, 136 S. Ct. 892 (2016). The issues raised are provided in the list at the end of this pleading; they again did not include the *Brady/Napue* violations he raises here, because he was unaware of them, as a result of the government hiding these violations, ending its supposed open file discovery, and falsely representing to the district court that it had maintained an open file discovery policy throughout the trial proceedings.

Mr. Bernard subsequently filed a Rule 60(b) motion with the trial court. The motion urged the court to reopen the § 2255 proceedings based on a procedural defect in that

---

[11] While beyond the scope of this Petition, the jurors apparently premised the sole death sentenced that they returned for Bernard on a mistaken belief that a fire caused Mrs. Bagely to suffer. *See* Clemency Petition at 11-12, 27-31 (attached as App_667-668, 683-87).

proceeding, namely that presiding judge Walter S. Smith, Jr., had been unfit to preside. The motion was filed after the Fifth Circuit Judiciary Council sanctioned Judge Smith for physical sexual assault and removed him from assignment to new cases for a year. The initial investigation revealed other significant ethical lapses, including that Judge Smith had allowed "false factual assertions" to be advanced on his behalf. After the adequacy of the initial investigation and punishment were called into serious question, the Judicial Conference ordered the Fifth Circuit to reassess Judge Smith's punishment and examine whether there was a pattern and practice to his behavior. Before such an inquiry could proceed, Judge Smith resigned. The motion was deemed a second or successive petition and dismissed. The Fifth Circuit denied Mr. Bernard's application for a certificate of appealability and the Supreme Court denied certiorari.

On February 4, 2019, Bernard moved in the Western District of Texas for relief from his death sentence, after learning (as explained above) that the government had suppressed favorable information throughout the entirety of the trial and original collateral review process. Bernard argued that by successfully concealing its own misconduct throughout his original § 2255 proceeding, the government had prevented him from timely presenting those penalty-phase issues, and that a proper reading of *Panetti v. Quarterman*, 551 U.S. 930 (2007), rendered his second-in-time motion non-successive. Alternatively, Bernard contended, he should be entitled to review of these penalty-phase claims in the district court via Fed. R. Civ. P. 60(b). Finally, Bernard argued that if these jurisdictional bases were unavailable, the district court should rule that strictly applying § 2255(h) to

7

block review of his *Brady* and *Napue* claims would violate the Suspension Clause of the United States Constitution, Art. I, § 9, cl. 2.

The district court found Bernard's argument about *Panetti* "compelling," but concluded it was bound by Fifth Circuit precedent to treat his petition as successive. *See* n. 7, *supra*. The court also rejected Rule 60(b) as a vehicle for considering the merits of Bernard's claims and his "suspension of the writ" argument. The court transferred the matter to the Fifth Circuit for determination of whether to authorize a successive petition. Order Amending Judgment, *United States v. Bernard*, No. 99-CR-00070, dkt. 667 (W.D. Tex. September 10, 2019).

The Fifth Circuit declined to authorize a successive petition under § 2255(h), because Mr. Bernard was attacking "only" his death sentence, not his conviction, and § 2255(h)(2) looks only to whether factfinders would have found the movant "guilty of the offense." *In re: Bernard*, 826 F. App'x 356 (5th Cir. Sept. 9, 2020). It also held that Mr. Bernard's petition was second or successive and that it was not properly heard under Rule 60(b). *United States v. Bernard*, 820 F. App'x 309 (5th Cir. 2020). Rehearing en banc was denied November 6, 2020. As a result, no court has yet addressed the merits of Mr. Bernard's *Brady/Napue* claims.

Because of the ongoing appeals, Bernard has challenged the Attorney General's setting of execution date as being unlawful.[11] But because the sentencing court has not yet

---

[11] Motion to Enjoin the Government from Executing Brandon Bernard until Appeals are Complete, *United States v. Bernard*, No. W-99-CR-0070-ADA-2 (November 13, 2020).

ruled on the issue and Bernard cannot risk being accused of improperly delaying the filing

of motions, he files this § 2241 motion now.

## III.    STATEMENT OF FACTS[12]

### A.    Introduction

In the spring of 2000, Mr. Bernard and codefendant Christopher Vialva were jointly

tried in the Western District of Texas on charges arising from a carjacking the previous

summer that had ended in murder.[13] The case involved a plan by five teenagers to abduct

and rob someone.[14] The plan went awry and ended with Mr. Vialva killing victims Todd

and Stacie Bagley by shooting them in the head at close range, after which their car was

set on fire. The government sought the death penalty against both Mr. Vialva and Mr.

Bernard, who were convicted on all counts. Among other aggravating factors, jurors found

that Mr. Bernard was "likely to commit criminal acts of violence in the future which would

be a continuing and serious threat to the lives and safety of others." App_46. No juror found

the mitigating factor that other, equally culpable participants would escape a death

sentence.[15] App_48.

---

[12] This Statement of Facts is essentially identical to that set forth in Bernard's Motion For Stay Of Execution.

[13] The charges were (1) carjacking resulting in death, *see* 18 U.S.C. § 2119; (2) conspiracy to commit murder, *see* 18 U.S.C. § 1117; and (3 and 4) the murders of Todd and Stacie Bagley, *see* 18 U.S.C. § 1111(a).

[14] The participants were Christopher Vialva (age 19), Bernard (18), Terry Brown (17), Tony Sparks (16), and Christopher Lewis (15).

[15] The three other teenagers were too young to face a death sentence under federal law. Brown and Lewis cooperated with the government and testified at trial. Both have since been released from federal custody. Sparks, who pleaded guilty separately and did not

**B. In 2018, the long-suppressed expert opinion of former Sgt. Sandra Hunt surfaced for the first time.**

In 2018, Mr. Bernard – by independently scouring the record of his codefendant Tony Sparks' 2018 resentencing – learned for the first time that prior to his 2000 trial, the government had possessed the opinions of a law enforcement expert that (1) the gang to which all the defendants were alleged by the government to belong (the "212 PIRU Bloods") was hierarchically organized; (2) Mr. Bernard's codefendants Tony Sparks, Christopher Vialva, and Terry Brown occupied relatively high positions in that hierarchy; and (3) Mr. Bernard occupied its very bottom rung. Mr. Bernard's *Brady* claim arises from the government's failure to disclose the existence of Sgt. Hunt's expert opinions and related documents to Mr. Bernard's trial counsel; the *Napue* claim arises from the government's having affirmatively misrepresented to the jury that the gang was not organized hierarchically at all, and then urging the jurors to treat Mr. Vialva and Mr. Bernard as equally culpable for the Bagleys' deaths.

In early 2017, Mr. Bernard's codefendant Tony Sparks was granted resentencing under *Miller v. Alabama*, 567 U.S. 460 (2012).[16] *See Sparks v. United States*, No. W-99-CR-070-3, 2018 WL 1415775 (W.D. Tex., March 19, 2018) at *1 and n.1. During Mr. Sparks' February 2018 resentencing hearing, the government called former Killeen Police Department Sergeant Sandra Hunt as an expert witness. Sgt. Hunt had previously headed

---

cooperate, was resentenced in 2018 to thirty-five years' imprisonment, and is projected for release in October 2030.

[16] The presiding judge in *Sparks* was Hon. Lee Yeakel.

the KPD's Gang Unit; her testimony addressed Sparks' position within the 212 PIRU Bloods. App_219-20.

The government introduced two one-page documents in support of Sgt. Hunt's testimony. The first was a sheet of notebook paper obtained by law enforcement from a Killeen high school student in 1998. App_303 (government Exhibit 66 from *Sparks* resentencing hearing) and App_222-226 (Sgt. Hunt's testimony explaining that exhibit). It comprised a scribbled handwritten chart decorated with arcane gang symbols and initials and containing gang members' nicknames arranged roughly in the shape of a triangle.

The second one-page document was created by the police themselves. It omitted most of the gang ephemera and replaced the gang members' nicknames with their true names, based on confidential information in KPD gang intelligence files. App_304 (government Exhibit 65 from *Sparks* resentencing hearing); App_223-229 (Sgt. Hunt's related testimony). When the United States Attorney's Office was preparing for Bernard's trial in 1999, it contacted Sgt. Hunt to ask her whether and where certain individuals' names appeared in this document; Sgt. Hunt consulted it in the course of providing a full response. App_246, 243-254.

As Sgt. Hunt explained in her 2018 testimony, the document originally obtained from the student and subsequently analyzed and refined by the police was actually a graphic representation of the gang's hierarchy. It showed that Sparks had held a relatively powerful position in the gang as an "enforcer," occupying the fifth rung of the hierarchy. App_225-26. Brown and Vialva occupied similar positions of power, the sixth and seventh rungs, respectively. In contrast, Mr. Bernard was listed as occupying the very lowest rung,

level 13. As Sgt. Hunt testified, Mr. Bernard's name was "at the very bottom" of the chart, "about 30 people below Mr. Sparks." App_226. In fact, according to that chart, Mr. Bernard was located 36 people below Sparks. App_303-04.

**C.    Sgt. Hunt's expert opinion was suppressed by the government.**

Until undersigned counsel learned in early 2018 about Sgt. Hunt's testimony in *Sparks*, Mr. Bernard knew nothing of Sgt. Hunt's 1998-99 investigation and conclusions regarding the structure of the gang, or the fact that Sgt. Hunt had briefed the federal prosecutors in his case in 1999-2000 concerning her conclusions that the 212 PIRU Bloods had a hierarchical organization and that Mr. Bernard was at its very bottom. The government never disclosed Sgt. Hunt's favorable expert opinions to Mr. Bernard's counsel prior to trial, or at any other time.[17] And as with Sgt. Hunt's expert testimony itself, App_219-36, the government has never claimed that it provided the chart that she produced to any member of Bernard's defense team. Reply Brief at 6-10, *United States v. Bernard*,

---

[17] Although the government has claimed that it disclosed the student-created chart, it has never claimed that it disclosed Hunt's expert opinion. *See, e.g*, Reply Brief at 6-10, *United States v. Bernard*, No. 19-70021, doc. 515341103 (5th Cir. March 11, 2020); Response to Appellant's Motion to Authorize Successive Motion under 28 U.S.C. § 2255, or, in the Alternative, to Recall the Mandate at 15-16, *Bernard v. United States*, No. 19-50837 (Fifth Cir. November 20, 2019); Fifth Circuit Appellee's Brief at 22, *United States v. Bernard*, No. 19-70021 (Fifth Cir. February 21, 2020), document 00515318955 ("Fifth Circuit Appellee's Brief"), App_559. And the record strongly suggests that the government did not because, had Sgt. Hunt's conclusions been disclosed, Bernard's trial counsel surely would have used them to challenge the testimony of Texas Ranger John Aycock. After being called by the government and asked specifically to address "who's in charge of Two-One-Two PIRU," Aycock testified that no hierarchy existed within the gang, explicitly denying – exactly contrary to Sgt. Hunt's 2018 testimony – that the gang had a pyramid structure. App_395.

No. 19-70021, doc. 515341103 (5th Cir. March 11, 2020) (App_583-583) (highlighting how the government's Response never claims that it disclosed either Sgt. Hunt as an exculpatory witness or her opinions in any form).[18]

### D. To support its arguments in favor of a death sentence for Mr. Bernard, the government presented evidence that directly conflicted with the expert opinion that it had suppressed.

During the sentencing hearing, the government contended that Mr. Bernard had thoroughly embraced a gang lifestyle and that, because of his connection to the gang, he was sure to commit acts of violence for the rest of his life. Given those facts, the government argued, jurors had little choice but to impose a death sentence on Mr. Bernard.

For example, the government called Anthony Davis, an intelligence officer for the Federal Bureau of Prisons, to provide testimonial support for the claim that Mr. Bernard would pursue violent gang-related activities in prison. App_412-19. Davis described at length the pervasiveness of the Bloods gang in federal prisons, and the violent crimes they commit, even in maximum security facilities. Davis testified that "Bloods" in prison strive to organize, "recruit[ing] as many members as they possibly can" so that they can "continue their criminal behavior and activity, just like they did out in the streets." App_412. And if

---

[18] In its Fifth Circuit filings, the government not only never claimed to have disclosed Sgt. Hunt's expert opinion, but never claimed to have disclosed the chart that the police created based upon the scribbled chart. *See generally*, Response to Appellant's Motion to Authorize Successive Motion under 28 U.S.C. § 2255, or, in the Alternative, to Recall the Mandate at 15-16, *Bernard v. United States*, No. 19-50837 (Fifth Cir. November 20, 2019), App_456-57; Fifth Circuit Appellee's Brief at 22, App_559. Bernard discusses at n. 24, *infra*, the problems with the government's claim that the handwritten chart was disclosed.

they fail to recruit additional Bloods, these gang members inevitably end up joining "more violent and more sophisticated gang[s] in the prison system." *Id.*[19]

The government intentionally elicited testimony from other witnesses that was directly at odds with Sgt. Hunt's undisclosed expert opinion. For example, it elicited from cooperating codefendant Terry Brown that everyone in the gang was considered equal. App_379-80. Likewise, the government presented testimony from Texas Ranger Aycock that the gang's founding members expressly wanted to avoid a hierarchical structure, because that would cause too much confrontation within the gang. App_395. All this testimony painted a grossly and harmfully misleading picture of the gang, since the government knew from Sgt. Hunt that some members of 212 PIRU *did* occupy positions of authority and status within the gang, and that Mr. Bernard, who existed on the gang's periphery, was definitely not one of them.

That Mr. Bernard was "at the very bottom" of the gang's structure suggested that he was significantly less culpable than those empowered to make and enforce decisions within the gang – people like Vialva, Sparks, and Brown. His lowly position also pointed toward the inference that he could escape the gang life, as he has in fact done. But successfully suppressing Sgt. Hunt's favorable opinion liberated the government to argue exactly the contrary, telling jurors that Bernard and Vialva alike were "top dogs … gangsters" who had "earned" a spot on death row:

---

[19] As noted supra n. 3, all this speculation about Bernard's behavior in prison has proven false.

> [Vialva] wanted to be the top gangster in Killeen. You need to recognize him for that. And you need to recognize Brandon Bernard for his assistance in that. Because if *they* want to be the top dogs and be the top gangsters, then give *them* the recognition that's earned *them* their seats right here in the courtroom.

App_429 (emphasis added).

As noted, the jury specifically found the presence of a non-statutory aggravating factor – that Mr. Bernard was "likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others." App_72. The jury also failed to find as a mitigating factor that other equally culpable defendants (*e.g.*, Sparks, Lewis, and Brown) were not facing a possible death sentence. App_74. Given that the jury spared Mr. Bernard's life on the two other death-eligible counts, a change in the jurors' findings on these two aggravating and mitigating factors likely would have changed their sentencing verdict as well. The suppressed expert opinion of Sgt. Hunt was the missing piece of evidence that would have cast these findings in an entirely different light and resulted in a life sentence for Mr. Bernard.

## IV. BERNARD'S DEATH SENTENCE WAS OBTAINED IN VIOLATION OF THE CONSTITUTION AND SHOULD BE REVERSED.[20]

### A. The government violated *Brady* and *Napue*, requiring reversal of Bernard's death sentence.

As shown in the factual recitation, Part III.A., *supra*, the government violated *Brady* and *Napue*, and second, those errors entitle him to a new penalty phase trial. "A *Brady* violation occurs when the government fails to disclose evidence materially favorable to

---

[20] The argument as to Bernard's allegations of constitutional violations is essentially identical to that set forth in Bernard's Motion for Stay Of Execution, Part III.B.1.

15

the accused." *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citation omitted). A *Napue* violation occurs when the government knowingly uses false testimony to obtain a result at trial. *Napue*, 360 U.S. at 269.

When the government fails to uphold its constitutional obligations under *Brady*, reversal is required whenever there is a "reasonable probability" of a different sentencing result. *United States v. Bagley*, 473 U.S. 667, 682 (1985). This does not require even that the probability is more likely than not. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). And, as explained in *Bagley*, 473 U.S. at 678 n. 9, *Napue* violations require reversal unless the government can demonstrate beyond a reasonable doubt that the error was harmless.

The facts recited above show that, to secure a death sentence against Brandon Bernard, the government elicited testimony that the teenage gang to which he belonged had no formal hierarchical structure, and that based on their presumably equal stature within the gang (in which both wanted to be "top dogs"), Bernard and Vialva were equally culpable. App_379-80, 395, 429. At no point did it suggest that Mr. Bernard was a mere peripheral member of the gang. On the contrary, a central theme in the government's case for death was that Mr. Bernard was an irredeemable gangster who would continue to embrace that identity in prison and act out violently on that account. *See, e.g.*, App_411-13.

16

These facts also show that, unbeknownst to the defense, the government's gang expert had told the government pretrial that the gang did in fact have a hierarchical structure and that Mr. Bernard occupied its very lowest level – far below every other charged defendant. App_718, 246, 218-236.

Despite its claim during trial that defense counsel were being afforded "open file" access to all relevant information, the government never disclosed this exculpatory expert opinion to Mr. Bernard's trial team. The government then abruptly closed its purportedly "open file" as soon as it secured a death sentence, never once permitting counsel on collateral review to inspect the government's file. Motion for Leave to Conduct Discovery and Brief in Support at 5-6, *United States v. Bernard*, No. 99-CR-00070, dkt 411 (W.D. Tex. November 12, 2004). And after closing its file, the government defeated the *Brady* claims that Bernard raised in the initial § 2255 proceeding by citing its claimed "open file" policy from trial. App_86, 111, 175-76, 305-306. This claim of an "open file" also hindered Mr. Bernard's ability to obtain discovery that would have led to the suppressed Sgt. Hunt opinion and exhibits. The district court cited the government's supposed "open file" policy from the pretrial period when denying Bernard's post-conviction discovery request. App_111, Order at 25, *United States v. Bernard*, No. W-99-CR-070, dkt. 449 (W.D. Tex. September 28, 2012).

As discussed, Mr. Bernard's post-conviction counsel discovered Sgt. Hunt's expert opinion only by reviewing the record of the 2018 resentencing of juvenile codefendant Tony Sparks. By 2018, however, Mr. Bernard's original § 2255 motion had long been denied. The government only disclosed Hunt's expert opinion during Sparks' 2018

17

resentencing because it showed that Sparks was a high-ranking member of the gang, which the government argued was a fact that supported the harshest possible sentence. When announcing Sparks' sentence, the sentencing judge cited Hunt's testimony as important and credible.[21]

The suppressed information was highly favorable to Mr. Bernard. Sgt. Hunt's expert analysis showed that three of Mr. Bernard's codefendants ranked high in the gang, where they would likely have acted as leaders in its criminal activity. In contrast, Mr. Bernard occupied the very lowest tier of the hierarchical structure; he was positioned to fall in line and do as he was told.

The suppressed information was also material, because it is reasonably probable that disclosure of Sgt. Hunt's expert conclusions about the gang's structure and Mr. Bernard's minimal role would have changed the sentencing verdict. Given the government's emphasis throughout the trial on purported gang ties among the defendants, Sgt. Hunt's expert opinion would have cast Bernard's whole connection to the gang in an entirely different light. In all probability, her compelling testimony would have persuaded at least one juror to conclude (and rightly, as it would turn out) that eighteen-year-old Brandon Bernard's links to the 212 PIRU Bloods were so weak that he was unlikely to seek out gang involvement in prison if his life were spared. Evidence of the materiality of Sgt. Hunt's

---

[21] App_267 (Memorandum Opinion Regarding Resentencing, *Sparks v. United States*, 2018 WL 1415775, at *6 (W.D. Tex. 2018) (expressly crediting Sgt. Hunt's testimony to find that Sparks had acted as an enforcer and was "not a tangential participant in the gang"), and App_286 (Oral Ruling at 12, lines 15-16 (March 19, 2018)).

expert opinion can also be seen in the Fifth Circuit's reliance on Mr. Bernard's claimed immersion in gang culture as a basis for upholding his death sentence. *Bernard*, 299 F.3d at 482.

Even without knowing that a police expert had identified Mr. Bernard as occupying the gang's very lowest rank, the jury spent nearly as much time deciding on Mr. Bernard's one death sentence as it did on its remaining sentencing verdicts for both defendants.[22] Expert evidence that Mr. Bernard occupied the gang's lowest rung would almost certainly have persuaded at least one juror to vote for life, particularly since jurors were required to evaluate both Mr. Bernard's future dangerousness and whether other equally culpable criminal actors were not facing death. The question of whether the mitigating factor – other equally culpable individuals not facing capital prosecution – was present was hotly contested in both sides' penalty-phase closing arguments. *See* App_432, 426 (ROA.5836; 5807). Information that Sparks, Vialva, and Brown were far above Bernard in the gang hierarchy[23] would have easily tipped the scale in Bernard's favor. And the conclusion that

---

[22] Jurors retired to deliberate at about 4:15 p.m. on June 12, 2000, working until 7:00 p.m. *See* App_434, 81, 83. In that interval, they sentenced Vialva to death on all three death-eligible counts, and sentenced Bernard to life imprisonment on two of those three. *See* App_14, 27, 40 (Vialva death verdicts, dated June 12); App_54, 67 (Bernard life verdicts, same). Deliberations resumed the next morning at 9:00 a.m., *see* App_83, with only Bernard's final sentence left to determine. That verdict required over two additional hours of deliberations, which concluded at about 11:15 a.m. on June 13. App_84; *see also* App_79 (Bernard's single death verdict, dated June 13).

[23] As noted, Sparks was 36 individuals above Bernard. App_303-04. Sparks ranked one rung above Vialva, and two above Brown. App_246.

the jurors likely would have found Sgt. Hunt's opinion evidence compelling is buttressed by the fact that Sparks' resentencing judge declared it so. *See* n. 21, *supra*.

Further, Sgt. Hunt's testimony putting Mr. Bernard at the bottom of the gang's hierarchy would have directly supported the defense theme that Bernard was a follower, not a leader. And expert testimony advanced by a disinterested law enforcement expert would have been especially powerful. This strong evidence that Bernard was a follower, not a leader, coming not from Mr. Bernard himself or any person aligned with him but from a *law enforcement expert*, was reasonably likely to have affected the jury's view of the aggravating factor of future dangerousness and the mitigating factor that codefendants who were equally or more culpable than Mr. Bernard (like Sparks and Brown, who far outranked him in the gang hierarchy) were not facing the death penalty.

The government violated *Napue* because it repeatedly elicited testimony that the 212 PIRU Bloods gang in fact was not hierarchically organized and that all members enjoyed equal status, which enabled it to argue at the penalty phase that all should be regarded as equally culpable for the gang's crimes. This was directly contrary to what the government knew from Sgt. Hunt – not only was there a hierarchy, but Bernard was at its very bottom.

Under the standards for reversal under *Brady* and *Napue*, p. 15-16, *supra*, the above facts demonstrate violations of *Brady* and *Napue* that require reversal of Bernard's death sentence.

**B.** **The government's responses to date only confirm that it violated *Brady* and *Napue*, requiring reversal of Bernard's death sentence.**

> **1.** ***The government's contentions about what was or wasn't disclosed ignore that the record clearly shows it knew in 1999 about Sgt. Hunt's expert opinion and failed to disclose that opinion to the defense.***

Because the *Brady/Napue* issues were briefed by both parties in the Texas district court and in the Fifth Circuit, this Court has a preview of the government's contentions on the *Brady/Napue* issues. (As noted, no court has ever addressed the merits of the *Brady/Napue* issues, due to procedural rulings that are the very basis for Bernard's right to bring these issues to this Court under § 2241.)

As mentioned at nn. 17-18, *supra*, the government has never denied that it did not disclose the chart created by the police or Sgt. Hunt's expert opinion; it has claimed only that it disclosed the handwritten chart. Whether the government in fact ever disclosed the handwritten chart ultimately does not matter, because the two charts differ significantly in their exculpatory value.[24] The handwritten chart would be inadmissible, other than through its student author, whose views on the gang's hierarchy, even assuming they were

---

[24] Although the government's suppression of Sgt. Hunt's opinion and the police-created chart means that it violated *Brady* and *Napue* even if it did disclose the obscure handwritten chart, the government's claim to have disclosed it is, in any event, unsupported by the record. The government first pointed to the fact that the chart was listed on an exhibit list. App_559 (Fifth Circuit Appellee's Brief at 22). But this doesn't prove that the actual chart was disclosed, only that it was listed as a potential exhibit. The government also claims that codefendant's counsel "acknowledged the government's exhibits were provided to him before trial[.]" *Id.* What codefendant's counsel actually said was that he'd gone through "several hundred exhibits," not that any particular exhibit had been produced. App_321. In short, there is no evidence that even the handwritten chart was provided.

admissible, would be orders of magnitude less valuable than that of a highly qualified law enforcement expert.

The government has suggested it had no obligation to disclose Sgt. Hunt's expert opinion because she was "only tangentially involved in the original investigation." Fifth Circuit Appellee's Brief at 7, App_544. The government's attempt to shed its *Brady* obligations by applying the label "tangential" is unavailing. No matter what her relationship to the overall investigation, Sgt. Hunt was involved in the investigation and her opinion was exculpatory; the government was therefore duty-bound to disclose it under *Brady*. But in truth, Sergeant Sandra Hunt was hardly "tangential" to the government's investigation into the gang at the center of the Bagley murders. When reviewing Sergeant Hunt's expert qualifications during her testimony at Sparks' 2018 resentencing, the government's counsel – the very same attorney who had prosecuted Bernard eighteen years earlier – outlined the great depth of experience that Sgt. Hunt had brought to the case. Sergeant Hunt started working in gang crimes within the Killeen Police Department in 1994. App_220. She worked in its gang unit when that specialized team was formally created in 1999 and had risen to serve as its supervisor by the time it was dissolved in 2005. *Id.* She completed at least 700 hours of "specific gang-related training." *Id.* And her primary function throughout this time was to analyze gang writings to identify gang members, which the gang unit monitored using an elaborate database that encompassed multiple sources and criteria. App_220-21. She was also Vice President of the Gang Investigators Association of Texas from 1994 to 2008. App_220. Sgt. Hunt brought all this expertise to bear in consulting with the government on Bernard's case in 1999, when she

was asked to opine on the hierarchical structure of the gang to which all the youths involved in the Bagley murders belonged. App_226. And, as detailed above, the nature of the gang was far from a tangential aspect of the government's case.

The government declared that "there is no evidence that [the] trial prosecutor had any knowledge about the potential testimony of a tangentially-involved local gang prosecutor, rendered 18 years after the trial took place." Fifth Circuit Appellee's Brief at 22, App_559; *see also id.* at 25-26, App_562-63 (making similar claim).[25] But the issue, of course, is not the government's knowledge of testimony at a future Sparks resentencing, but knowledge of Sgt. Hunt's opinion, as it existed in 2000. The trial prosecutor's own words show that he was *in fact* aware of Sgt. Hunt's favorable expert opinion at the time of Bernard's trial. There can be no serious debate about this. The same federal prosecutor who prosecuted Bernard in 2000 handled Sparks' resentencing in 2018. His exchanges with Sgt. Hunt during that proceeding demonstrate that he had consulted with her in advance of the 2000 trial:

> AUSA: .... You're familiar with the incident that took place on June 21st, 1999 in Killeen where Todd and Stacie Bagley were kidnapped and murdered?
>
> Sgt. Hunt: I am.

---

[25] The government's focus on the trial prosecutors' "knowledge" about Hunt's "potential testimony" years later muddies the key question under *Brady*: did the government know, or should it have known, of her exculpatory expert opinion *in 1999*? The Supreme Court has made clear that the government cannot avoid its *Brady* obligations by sequestering away the exculpatory information with a law enforcement official who takes care not to share the information with the prosecuting attorneys. *See, e.g., Kyles v. Whitely*, 514 U.S. 419, 437 (1995) (under *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police").

AUSA:        Did you *at that time, at our request*, go back to see if any of the identities of any of the other people who were involved in that were on this chart?

                            ….

Sgt. Hunt:   I did. Brandon Bernard, also known as "Dip," is at the very bottom of the chart of pyramid, second name in, about 30 people below Mr. Sparks. [App_226 (emphasis added)]

Only by hoping the court ignores this exchange could one insist, as the government does here, that "no evidence" shows that the trial prosecutor had contemporaneous knowledge of Hunt's expert opinion in 2000. Fifth Circuit Appellee's Brief at 22, App_559.[26]

> **2. The government's contentions about the materiality of Sgt. Hunt's opinion rely on misleading descriptions of the evidence and are contrary to the government's position at trial, which relied heavily on tying Bernard tightly to the Bloods.**

The government has also denied that Hunt's favorable opinion was material. There were a few components to this argument. In part, the government pointed to some testimony that suggested that the gang in fact did have a hierarchy. Fifth Circuit Appellee's Brief at 27, App_564. In fact, little of what the government cited to supports their position; that which does came from lay witnesses. The unconditional expert opinion of a highly qualified law enforcement officer that there was in fact a detailed hierarchy would have

---

[26] In the same vein, the government asserted that Sgt. Hunt's "descriptions of the diagram *in 2018* was not in the government's possession in 2000." Fifth Circuit Appellee's Brief at 25-26 (emphasis added), App_562-63. That's true: testimony given in 2018 doesn't exist in 2000. But the above-quoted transcript shows that Sgt. Hunt's favorable opinions *existed and were known to the government* in 2000.

done far more to contradict the government's repeated evidence – insisting that there was no hierarchy – than a few isolated comments from random lay witnesses. In any event, Sgt. Hunt's expert opinion included the critical fact that *Mr. Bernard was at the very bottom of that hierarchy*. Even if the government were correct that some evidence before the jury suggested (contrary to the main thrust of the government's presentation) a hierarchical structure, it would not affect the materiality of Sgt. Hunt's suppressed opinion regarding Mr. Bernard's lowly position within that hierarchy.

The government also referred to testimony that Sparks and Vialva were "climbers" within the gang. *Id.* But of course, the fact that two other members of the gang were "climbers" within the gang is a far cry from showing that Mr. Bernard was at the very bottom of the gang.

The government has also suggested that Sgt. Hunt's expert opinion was immaterial because other evidence would have allowed jurors to infer that "Mr. Bernard had a lesser role in the gang." Fifth Circuit Appellee's Brief at 5, App_542. But the testimony the government cites offers no support whatsoever for that characterization. [27] The government also claimed that witnesses "denied that Bernard was a full-fledged member of the gang; he only 'associated'" with the gang. *Id.* (citing to App_331,32, 337, 344, 349, 356, 361-62,

---

[27] In support of that assertion, the government cited to Texas Ranger Aycock's testimony at App_407. There, Aycock testified that, Brown "was more of a person who would follow," and immediately followed that with a description of Bernard as "a person who would assist and help and would not run from a fight." *Id.* Vialva was described as having "more brains" and "more reckless." Nothing in this testimony even remotely suggests that Mr. Bernard was at the very bottom of a hierarchical power structure, with Brown and Vialva far above him.

365, 368, 392). That claim is extremely misleading, as even a glance at the record shows.[28]

And regardless of any fleeting suggestions from a few lay witnesses that Bernard may not have been a full-fledged member of the gang, that evidence did not stop the government from arguing that Vialva and Bernard were both "gangsters," App_429, or from presenting extensive evidence that Bernard was so closely tied to the gang that he would necessarily affiliate with the Bloods in prison and commit violent acts for years to come.[29] In light of this evidence and argument by the government concerning Mr. Bernard's purported gang

---

[28] In the passages to which the government has pointed, Ranger Aycock testified that Bernard associated with the 212 PIRU, App_392, but did not suggest in any way that he "only" associated, or that his "association" was anything less than full-fledged membership. In fact, Aycock used the same description for everybody but Sparks (*i.e.*, for Bernard, Vialva, Brown, and Lewis). Brown testified that Bernard was in a Blood gang, but a different one from the 212 PIRU. App_ 331-32. Another witness "considered him like Two-One-Two." App_337. Another said variously (1) he didn't know whether Bernard was part of the gang, App_344; (2) that Bernard associated with the gang but he didn't know if Bernard had "ever been jumped in," (initiated) App_349; and (3) that Bernard hung around with the gang but he didn't know if Bernard was a member, App_356. One individual, asked if Bernard was an actual member or associates with them, stated that he associates with them. App_361-62. Lewis stated variously that (1) he did not know for sure which gang Bernard belonged to, App_365; and (2) he knew Bernard was in different Blood gang, App_368.

[29] For example, the government elicited testimony from (1) Brown, that Bernard was a member of 212 PIRU, App_326; (2) Gregory Lynch, that Bernard wore Blood colors, App_337-38; (3) Brown, that a photograph depicted Bernard "[t]hrowing up gang signs" and that all persons depicted in that photograph were "all Bloods," App_374; (4) John Bowman, Gang Intelligence Officer for the school district, regarding a photograph he took of Bernard with slip-on teeth with the letters "C.K." ("Crip Killer," referencing a rival gang), App_384-85 (the government also elicited testimony from Brown and Aycock regarding the same facts, App_373, 392); and (5) Bowman, referring to "Bernard and a few other of his gang members" and an altercation with "rival gang members," App_387-88.

connections and activity, any contention that Sgt. Hunt's favorable opinion was not material is untenable.

And regardless of any lay testimony about the structure of the gang, the opinion of a law enforcement expert can hardly be deemed cumulative to that testimony. *See*, *e.g.*, *Boss v. Pierce*, 263 F.3d 734, 745 (7th Cir. 2001) (stating that "[i]ndependent corroboration of the defense's theory of the case by a neutral and disinterested witness is not cumulative of testimony by interested witnesses, and can undermine confidence in a verdict."); *Skipper v. South Carolina*, 476 U.S. 1, 7-8 (1986) (finding that jailers' testimony about defendant's good behavior in jail was not "merely cumulative" of similar testimony from the defendant and his wife, because jurors would "quite naturally" give "much greater weight" to the testimony of "disinterested witnesses" like the jailers, who "would have had no particular reason to be favorably predisposed toward [the defendant].")

Another component of the government's "not material" contention was evidence showing that Vialva and Sparks had a greater role in the *crime*, while Bernard still had, in the government's view, a significant role. Fifth Circuit Appellee's Brief at 29-30, App_566-67. But this completely ignores that a major focus of the government's argument for death went beyond what occurred during the crime, to contend that Bernard was "likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others," as the jury found. App_46. To support this claim, the government introduced extensive evidence regarding the role of gangs in prison. As mentioned, for example, the government presented an FBI intelligence officer to testify at length about the Bloods' activity in prisons. App_410-21. This testimony made possible a

27

government penalty-phase closing that, with the exception of citing the loss suffered by the Bagleys' relatives and friends, focused almost exclusively on the gang connections of the two defendants. There is at least a reasonable probability that a government expert's conclusion that Mr. Bernard was at the very bottom of the gang's hierarchy would have changed the view of at least one juror, especially given the jury's struggle to reach a death verdict against Bernard. *See* n. 22 and accompanying text.

In sum, none of the weak defenses the government offered in the proceedings in the Fifth Circuit can avoid the conclusion that the government violated *Brady* and *Napue*.

## V.   THIS COURT HAS JURISDICTION TO CONSIDER BERNARD'S CLAIM UNDER 28 U.S.C. §§ 2255(E) AND 2241.[30]

Mr. Bernard's Petition also demonstrates that his claims are cognizable under § 2241. Before addressing the specifics of why this is so, it is worth noting what is at stake in the ultimate ruling on the issue of § 2241 cognizability. Failing to provide relief under § 2241 would mean sending Mr. Bernard to his death based on an unlawfully obtained sentence. It would also incentivize the government in future capital prosecutions to do exactly as it did here – unconstitutionally hide evidence throughout trial and an initial § 2255 proceeding that it is duty-bound to disclose, undermining not just the jury's ability to return a just verdict but also the defendant's ability to seek collateral review of the original *Brady* violation.

A federal habeas petitioner is entitled to review under § 2241 when § 2255 is

---

[30] The argument as to this Court's jurisdiction to consider Bernard's claim is essentially identical to that set forth in Bernard's Motion for Stay Of Execution, Part III.B.2.

"inadequate or ineffective to test the legality of his detention" or sentence. 28 U.S.C. § 2255(e) (the "savings clause").[31] The Seventh Circuit has examined that provision in several recent decisions. *See Purkey v. United States*, 964 F.3d 603 (7th Cir.), *reconsideration denied*, 812 F. App'x 380 (7th Cir. 2020), *and cert. denied*, No. (20A12), 2020 WL 4006838 (U.S. July 16, 2020); *Lee v. Watson*, 964 F.3d 663 (7th Cir. 2020); *Bourgeois v. Watson*, 977 F.3d 620 (7th Cir. 2020); and *Vialva v. Watson*, 975 F.3d 664, *2 (7th Cir. 2020).

Although none of these decisions found jurisdiction under the savings clause, their discussions of its operation and purpose, and the ways in which those petitioners' claims and procedural histories differ markedly from Mr. Bernard's, make clear that Mr. Bernard's *Brady* and *Napue* claims are cognizable under § 2241 (or, at the very least, that there is a strong likelihood of success on that issue, which is sufficient to warrant a stay).

In *Purkey*, the court recognized that the savings clause of § 2255(e) must be flexibly interpreted, to provide a mechanism to cure a fundamental injustice that § 2255 would otherwise leave unremedied. *See* 964 F.3d at 615 (noting that the court could not list all possible scenarios that would fall under the savings clause). For a case to fall under the savings clause, "there must be a compelling showing that, as a practical matter, it would be impossible to use section 2255 to cure a fundamental problem." *Purkey*, 964 F.3d at 615. The fact that a proper application of § 2255 would result in the denial of relief is not

---

[31] It is settled that § 2241 comprehends challenges to a habeas petitioner's sentence, in addition to his conviction. *See Brown v. Caraway*, 719 F.3d 583 (7th Cir. 2013).

enough to trigger the savings clause. *Id.* Rather, there must be "something 'structurally inadequate or ineffective about section 2255 as a vehicle'" for a petitioner's claim to fall under the savings clause. *Bourgeois*, 977 F.3d 620 at 636 (quoting *Purkey*, 964 F.3d at 615).

Under the tests outlined in *Purkey* and *Bourgeois*, Bernard's claims fall squarely within the savings clause. First, there can be no doubt that Bernard has identified a "fundamental problem" with his death sentence. The jury called for his execution when it is reasonably likely (at the very least) that they would have reached a different result had the government not hidden important information from them, which allowed the government to urge the death penalty based on grounds that the government knew well did not apply to Mr. Bernard.

And when the government has successfully hidden such information throughout the pendency of an initial § 2255 motion, there is "something 'structurally inadequate or ineffective about section 2255 as a vehicle'" to cure the underlying fundamental problem with the trial verdict. Bernard had to bring his initial § 2255 motion within one year of the conclusion of direct review, to litigate the claims he could reasonably discover and develop at that time. But once the litigation of that motion was complete, there was no mechanism under § 2255 to litigate the sentencing-phase *Brady/Napue* violations that came to light in 2018, whose factual underpinnings the government not only successfully concealed during trial, but also made false representations about during the entirety of Bernard's original

§ 2255 proceeding.[32]

The government's misconduct succeeded in denying Mr. Bernard the one full and fair round of collateral review that § 2255 contemplates and the Constitution guarantees.[33] The Fifth Circuit's refusal to address the merits of Mr. Bernard's *Brady/Napue* claims, in a case where the government prevented him from advancing those claims in his original § 2255 petition, reveals the structural inadequacy of § 2255's statutory scheme in the unusual circumstances presented here. Under the tests set forth in *Purkey* and *Bourgeois*, *supra*, Bernard falls within the savings clause and is entitled to bring a § 2241 petition to obtain review of his meritorious *Brady* and *Napue* claims.

The *Vialva* case buttresses this conclusion. There, the Court of Appeals observed that "[t]his circuit has held that § 2255 can be deemed 'inadequate or ineffective' when

---

[32] The Government may contend that there is nothing "structural" about § 2255 that causes the problem Mr. Bernard faces – after all, if the Government had not hidden the *Brady* material until 2018, then Mr. Bernard could have brought the claim in his initial § 2255 motion. By that view, Mr. Bernard's inability to raise his claim now is simply a happenstance of the case, comparable to the failure of any other prisoner to discover potentially relevant facts in time to include them in an initial § 2255 motion. But any such argument must fail. *Brady* claims warrant heightened protection precisely because the government's suppression of favorable evidence can corrupt the entire trial and collateral review proceedings. That is what is different about *Brady* material; it's not just new evidence, but new evidence that the government unconstitutionally concealed. *See*, *e.g.*, *United States v. Agurs*, 427 U.S. 97, 110-11 (1976) (discussing how evidence wrongly withheld by the government "places it in a different category than if it had simply been discovered from a neutral source after trial," requiring a different, more forgiving, standard for obtaining a new trial than other new evidence).

[33] *See, e.g.*, *Purkey v. United States*, 964 F.3d 603, 617 (7th Cir.) ("The idea of an entitlement to one untainted opportunity to make one's case is deeply embedded in our law."), *reconsideration denied*, 812 F. App'x 380 (7th Cir. 2020), and *cert. denied*, No. (20A12), 2020 WL 4006838 (U.S. July 16, 2020).

… newly disclosed facts support a constitutional theory that could not have been litigated on an initial proceeding under § 2255, *see Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (en banc)." *Vialva,* 975 F.3d 664, *2.

That is precisely the situation here. Mr. Bernard's petition relies on newly discovered facts – facts that he neither had access to nor could use because the government unconstitutionally hid them. And Mr. Bernard cannot be faulted for failing to discover this information earlier, since the government had an affirmative obligation to disclose such evidence and continually represented to the district court that it in fact had done so, purportedly through an "open file" discovery process. We now know that whatever policy was followed prior to Mr. Bernard's trial, the government never, then or thereafter, disclosed the existence of Sgt. Hunt's expert opinion. Defense counsel cannot be forced to "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Banks v. Dretke*, 540 U.S. 668, 695 (2004); *see also id*. ("A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process."); *see also Strickler v. Greene*, 527 U.S. 263, 283 n. 23 (1999) ("if a prosecutor asserts that he complies with *Brady* through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under *Brady*.").

In this case, the government had developed prior to trial the mitigating facts that now support Bernard's *Brady/Napue* claims. But having developed those mitigating facts, it promptly hid them away, depriving Mr. Bernard of any opportunity to use them at sentencing or litigate these constitutional claims in his original § 2255 proceeding.

32

Even though all the equities in this case reside with Mr. Bernard, the Fifth Circuit interpreted § 2255 to give the government a windfall, immunizing its unconstitutional suppression of Sgt. Hunt's favorable opinion from judicial review by deeming Mr. Bernard's claims barred under the successive petition doctrine.[34] And, as the Fifth Circuit interpreted § 2255(h), no successive petition can be authorized because the claims implicate Mr. Bernard's death sentence alone, rather than his conviction. *In re Bernard*, 826 F. App'x 356 at *1.

The great injustice here is that, absent this Court's intervention under the authority of the savings clause, Mr. Bernard will be executed without having been afforded any forum for review of his compelling *Brady/Napue* claims, when it was the government's unconstitutional actions, rather than any fault of Mr. Bernard's, that closed the courthouse doors. Certainly these facts bring this case firmly within the reach of § 2255(e)'s saving clause – a route to review that, as the *Purkey* court recognized, must be available to cure a fundamental injustice that § 2255 would otherwise leave unremedied. *See* 964 F.3d at 615. This conclusion is buttressed by *Vialva*, which echoed *Webster* in promising that the savings clause will be available where "newly disclosed facts support a constitutional theory that could not have been litigated on an initial proceeding under § 2255." Put another way, Mr. Bernard's § 2241 motion must be allowed to proceed because otherwise he will be denied all opportunity to litigate the constitutional claims advanced here –

---

[34] As noted, Bernard contended that under a proper analysis of § 2255 in light of *Panetti*, his second-in-time petition in fact was not successive. But the Fifth Circuit rejected that contention. *United States v. Bernard*, 820 F. App'x 309 (5th Cir. 2020).

claims he could not have presented in his § 2255 petition because the government failed to disclose facts that it was constitutionally obligated to disclose. The government created this problem, and § 2241 provides the constitutionally necessary cure.

The contrast between Mr. Bernard's *Brady/Napue* claims and those the Seventh Circuit has found to fall outside the savings clause could not be starker. For example, Purkey's claim (ineffective assistance of trial counsel) was fully available to him at the time of his original § 2255 proceeding; he asserted that it was omitted due to ineffective assistance of his habeas counsel. The court observed, "At the time Purkey filed his motion under section 2255, nothing formally prevented him from raising each of the three errors he now seeks to raise in his petition under 2241." 964 F.3d at 615. The *Lee* case presented a scenario indistinguishable from that of *Purkey*. *Lee*, 964 F.3d at 667. But here, the government manifestly prevented Mr. Bernard from raising the *Brady/Napue* claims that he advances here, by hiding the source material until a time at which no procedural mechanism any longer existed for raising the claims in the Fifth Circuit.

Bourgeois had raised via § 2255 a claim that he was intellectually disabled, and thus ineligible for the death penalty. In attempting later to bring the same claim into this Court via § 2241, he averred not that he had been unable to obtain a ruling on the claim in his § 2255 action, but only that "the § 2255 court was wrong" in rejecting his intellectual disability claim on the merits. 977 F.3d 620 at *11. But here, the § 2255 court never had a chance to be right or wrong on the merits of Mr. Bernard's *Brady* and *Napue* claims, because the Fifth Circuit effectively ruled that, by suppressing the favorable evidence for so long, the government had succeeded in placing Mr. Bernard's misconduct claims

beyond the power of the courts to adjudicate under § 2255. Lastly, Vialva (who was Bernard's codefendant) *had*, like Bourgeois, raised the relevant claim (for Vialva, as for Purkey, a claim of ineffective assistance of trial counsel) in his original § 2255 petition, and obtained a ruling on the merits.

In short, Mr. Bernard's case – unlike *Purkey*, *Lee*, *Bourgeois*, and *Vialva* -- comes within the Seventh Circuit's test for when the savings clause makes review available under § 2241. The same conclusion results from asking what Congress's intent must have been regarding the scope of § 2255(h). "Whatever finality interest Congress intended for AEDPA to promote, surely it did not aim to encourage prosecutors to withhold constitutionally required evidentiary disclosures long enough that verdicts obtained as a result of government misconduct would be insulated from correction." *Scott v. United States*, 890 F.3d 1239 (11th Cir. 2018).[35] Yet any contrary interpretation of the savings clause would have that very effect. To remedy the fundamental problem in this case, one that § 2255 leaves unremediable because of its structure, the savings clause gives this Court jurisdiction.

---

[35] *Scott*'s comment was made in the context of considering what should constitute a second or successive petition under *Panetti v. Quarterman*, 551 U.S. 930 (2007). But given the Fifth Circuit's conclusion that Bernard's petition is successive for purposes of seeking relief under § 2255, Congress must have intended the savings clause to address the problem that results when *Brady* violations remain hidden until after the first § 2255 proceeding is completed. *See also Douglas v. Workman*, 560 F.3d 1156, 1195 (10th Cir. 2009) (Congress "cannot" have aimed to encourage prosecutors to conceal exculpatory evidence "until it is too late, preventing the habeas petitioner from asserting the existence of such [exculpatory evidence] in his initial habeas petition and thereby insulating egregious government behavior from any habeas review").

## VI.     PRAYER FOR RELIEF.

This Court should stay Mr. Bernard's execution, conduct an evidentiary hearing,

and grant relief from Mr. Bernard's death sentence.

Respectfully submitted,

**ROBERT C. OWEN**
Law Office of Robert C. Owen, LLC
Jackson Blvd., Ste. 1056
Chicago, Illinois 60604
Phone: (512) 577-8329
Email: robowenlaw@gmail.com
Texas Bar No.: 15371950

**JOHN R. CARPENTER**
Assistant Federal Public Defender53 W.
Federal Public Defender for the
Western District of Washington
**1331 Broadway, Suite 400**
Tacoma, Washington  98402
Phone: 253.593.6710
Email: john_carpenter@fd.org
Washington Bar No.: 23301

Counsel for Petitioner

Dated: November 24, 2020

**STATEMENT IN COMPLIANCE WITH LOCAL CRIMINAL RULE 38-2(C):**

| Court: | Case #: | Case Caption | Ruling Date |
|---|---|---|---|
| Fifth Circuit COA | 00-50523 | *United States v. Brandon Bernard* Direct Appeal, 299 F.3d 467 (5th Cir. 2002) | Denied 07/19/2002 |
| | | [Petition for Rehearing En Banc denied, 51 Fed.App'x. 931] | Denied 10/10/2002 |
| US Supreme Court | 02-8492 | *Brandon Bernard v. United States* Petition for Writ of Certiorari, 539 U.S. 928 (2003) | Denied 06/16/2003 |
| USDC WD Texas | CR99-0070(2) CV04-0164 | *Brandon Bernard v. United States.* Denial of Amended Motion to Vacate Judgment Under 28 U.S.C. § 2255, [Dkt. 449] | Denied 09/28/2012 |
| | | Denial of Motion to Alter or Amend Judgment Under Rule 59(e), [Dkt. 473] | Denied 02/08/2013 |
| Fifth Circuit COA | 13-70013 | *United States v. Brandon Bernard* Motion for Certificate of Appealability, 762 F.3d 467 | Denied 08/11/2014 |
| | | [Petition for Rehearing En Banc denied, document: 00512807460] | Denied 10/20/2014 |
| US Supreme Court | 14-8071 | *Brandon Bernard v. United States* Petition for Writ of Certiorari | Denied 01/19/2016 |
| USDC WD Texas | CR99-0070 | *United States v. Brandon Bernard* Denial of Motion for Relief from Judgment Pursuant to Rule 60(b), [Dkt. 571] | Denied 12/20/2017 |

| Fifth Circuit COA | 18-70008 | *United States v. Brandon Bernard* Application for Certificate of Appealability Regarding Denial of Rule 60(b) Motion, [Document: 00514642203] | Denied 09/14/2018 |
| US Supreme Court | 18-6992 | *Brandon Bernard v. United States* Petition for Writ of Certiorari | Denied 01/13/2020 |
| USDC WD Texas | CV04-0164 CR99-070(2) | *United States v. Brandon Bernard* Denial of Motion to Vacate Judgment Under 28 U.S.C. § 2255, [Dkt. 664] | Denied 08/08/2019 |
| | | [Order Granting] Motion to Amend Judgment Pursuant to Rule 59(e) [Dkt. 667] | Granted 09/15/2019 |
| Fifth Circuit COA | 19-50837 | *In re: Brandon Bernard v. United States* Application for Authorization to File Second or Successive Petition, 826 F. App'x 356 | Denied 09/09/2020 |
| Fifth Circuit COA | 19-70021 | *United States v. Brandon Bernard* Appeal of Treatment of § 2255 as Second or Successive Petition, 820 F. App'x 309 | Remand 09/09/2020 |
| | | [Petition for Rehearing En Banc Denied, Document: 00515629904] | Denied 11/06/2020 |

## SUPPLEMENTAL STATEMENT OF ISSUES RAISED IN PRIOR PROCEEDINGS

---

**Fifth Circuit COA No.: 00-50523**
**Issues Raised in Defendant-Appellant's Opening Brief,**
(filed May 07, 2001)

---

**ISSUE 1**     The Finding that Bernard "Is Likely to Commit Criminal Acts of Violence in the Future Which Would be a Continuing and Serious Threat to the Lives and Safety of Others" Is Not Supported by Sufficient Evidence.

**ISSUE 2**     Bernard's Death Sentence Violates the Eighth Amendment and 18 U.S.C. § 3595(c)(2)(A) Because the Pecuniary Gain Aggravating Factor was Defined Too Expansively and Was Not Supported by Sufficient Evidence.

**ISSUE 3**     Bernard's Death Sentence Violates the Eight Amendment and 18 U.S.C. § 3595(c)(2)(A) Because the "Especially Heinous, Cruel, or Depraved" Aggravating Factor Was Too Broadly Defined and Unsupported by Sufficient Evidence of Bernard's Own Actions.

**ISSUE 4**     Bernard's Death Sentence Violates the Eighth Amendment and 18 U.S.C. § 3595(c)(2)(A) Because the Jury Arbitrarily Found that He Did Not Establish the Existence of the Mitigating Factor That He Was 18 Years Old When He Committed the Offense.

**ISSUE 5**     The Trial Court's Failure to Conduct An Adequate Inquiry Into the Prejudicial Communications Between A Third Party (or Parties) and a Juror (or Jurors) Violated Bernard's Rights Under the Fifth, Sixth, and Eighth Amendments and Under Fed. R. Crim. P. 43.

**ISSUE 6**     Bernard's Death Sentence Violates the Establishment Clause of the First Amendment, the Eighth Amendment, the Due Process Clause and 18 U.S.C. § 3595(c)(2)(A) Because Religious Beliefs Were Allowed to Play an Improper Role in the Sentencing Decision.

**ISSUE 7**     Testimony By the Government's Victim Impact Witnesses About the Character and Worth of the Victims, as Opposed to the Impact the Crime had on the Victims and Their Families, Violated the Eighth Amendment, the Due Process Clause and 18 U.S.C. § 3595(c)(2)(A).

**ISSUE 8**     Because the Government's Victim Impact Testimony Risked Encouraging A Verdict Based on Emotion Rather Than Reason, It was Unfairly Prejudicial and More Prejudicial than Probative, and Its Admission Violated the Eighth Amendment, the Due Process Clause and 18 U.S.C. § 3593(c)(2)(A).

**ISSUE 9**      The Court Violated Bernard's Rights Under the Establishment Clause of the First Amendment, the Eighth Amendment and the Due Process Clause by Allowing a Victim's Parents to Characterize Him As the Hard-Hearted, Spiritually Blind Slayer of Christian Martyrs Who Risked Their Lives to Save His Soul.

**ISSUE 10**      Bernard's Rights Under the Eighth Amendment and the Due Process Clause were Violated by Testimony from a Victim's Parent Describing the Emotional Harm that he Suffered From Observing the Guilt Phase of the Trial and Characterizing the Evidence that He Heard.

---

**Additional Issue Raised in Supplemental Brief; 5ᵗʰ Cir. 00-50523**
**(Filed Sept. 06, 2002)**

---

**ISSUE 11**      Bernard's Death Sentence Violates the Fifth, Sixth, and Eight Amendments Because the "Mental State Factors" and "Statutory Aggravating Factors" Which Increased the Maximum Potential Punishment From Life Imprisonment to Death Were Not Found By the Grand Jury and Alleged in the Indictment.

---

**Issues Raised in Amended 28 U.S.C. § 2255 Motion; USDC W.D. Texas;**
**Civil No.: W-04-CV-164; Criminal No.: W-99-Cr-70 (2) [Dkt. 416]**
**(Filed December 08, 2004)**

---

**ISSUE 1**      Petitioner Received Ineffective Assistance of Counsel During the Time from His Counsel's Appointment Until the Time of Trial in Violation of His Rights Under the Sixth Amendment to the United States Constitution.

**ISSUE 2**      Petitioner Received Ineffective Assistance of Counsel During the Guilt Phase Portion of His Trial in Violation of His Rights Under the Sixth Amendment to the United States Constitution.

**ISSUE 3**      Petitioner Received Ineffective Assistance of Counsel During the Penalty Phase Portion of His Trial in Violation of His Rights Under the Sixth and Eighth Amendments to the United States Constitution.

**ISSUE 4**      Petitioner Was Deprived of His Right to Due Process and a Fundamentally Fair Trial Under the Fifth, Sixth and Eighth Amendments to the United States Constitution Due to Prosecutorial Misconduct.

**ISSUE 5**      Petitioner Was Deprived of His Right to Counsel Under the Fifth and Sixth Amendments to the United States Constitution and 18 U.S.C. Section 3005.

**ISSUE 6**     Petitioner Was Deprived of His Right to a Fair Trial Under the Fifth and Sixth Amendments to the United States Constitution Due to the Inclusion of a Biased Juror In His Jury.

**ISSUE 7**     Petitioner Was Deprived of His Rights Under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution Because of Racial Bias During the Death Penalty Authorization Process and Because of the Rarity with Which the Federal Death Penalty is Imposed.

**ISSUE 8**     Petitioner Was Sentenced to Death in Violation of the Fifth, Sixth and Eighth Amendments to the United States Constitution Because the Indictment Did Not Include the Mental State Elements and Aggravating Factors Necessary to Make Him Death-Eligible.

**ISSUE 9**     The Manner of Execution Prescribed for Petitioner - Lethal Injection Violates Petitioner's Rights Under the Eighth Amendment to the United States Constitution.

**ISSUE 10**    The Cumulative Effect of the Errors in Petitioner's Trial and Sentencing Violates the Fifth, Sixth and Eighth Amendments to the United States Constitution.

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all registered parties.

I further certify that I mailed one copy of the foregoing document to Defendant Brandon Bernard via U.S. mail.

s/ Amy Strickling, Paralegal
Federal Public Defender Office