IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRANDON BERNARD,                          )
                                          )
                    Petitioner,           )     No. 2:20-CV-616
          v.                              )
                                          )     CAPITAL CASE
T.J. WATSON,                              )     EXECUTION SCHEDULED FOR
Warden, Federal Correctional              )     DECEMBER 10, 2020
Complex (FCC) Terre Haute,                )
                                          )
                    Respondent.           )

## GOVERNMENT'S RESPONSE IN OPPOSITION TO BRANDON BERNARD'S MOTION FOR STAY OF EXECUTION

This Court should deny petitioner Brandon Bernard's motion to stay his execution, currently scheduled for December 10, 2020, pending consideration of his petition for a writ of habeas corpus under 28 U.S.C. § 2241. Bernard fails to meet even the first requirement for a stay of execution because he cannot show a substantial likelihood of success on the merits. His § 2241 motion asserts claims that Bernard previously sought to raise in the Western District of Texas in a successive motion to vacate under 28 U.S.C. § 2255, and the Fifth Circuit denied him authorization to file a successive motion. Bernard cannot avail himself of § 2241 because he cannot show that his remedy under § 2255 was inadequate or ineffective to test the legality of his sentence. Bernard also cannot show a likelihood of success on the merits of his *Brady* and *Napue* claims, and the balance of equities favors allowing the government to carry out his lawful sentence,

imposed nearly two decades ago for horrific crimes. Accordingly, his motion for a stay should be denied.

## BACKGROUND

**A.    The Murders of Todd and Stacie Bagley**

In 1999, Bernard and other members of a street gang in Killeen, Texas, carjacked and murdered Todd and Stacie Bagley. *See United States v. Bernard*, 299 F.3d 467, 471–73 (5th Cir. 2002). Gang members—including Christopher Vialva and Tony Sparks—initially developed a plan to abduct and rob a motorist at gunpoint, use the victim's bankcard to make ATM withdrawals, and abandon the victim in a remote area locked inside his own car trunk. *Id*. at 471.

Bernard drove Vialva and the others from one store parking lot to another searching for a victim. *Bernard*, 299 F.3d at 471. After some time, Bernard temporarily departed. *Id*. at 472 & n.2. Vialva and two other gang members then convinced the victims, Todd and Stacie Bagley, to give them a ride. *Id*. at 471–72. After the gang members entered the Bagleys' car, they robbed the Bagleys at gunpoint with Bernard's gun, forced the Bagleys into the trunk of their own car, and attempted to empty the Bagleys' bank account from multiple ATMs. *Id*.

After Bernard and a fifth gang member rejoined the group, Vialva explained that he had to kill the Bagleys because they had seen his face. *Bernard*, 299 F.3d at 472. At Vialva's direction, Bernard and another gang member went to purchase accelerant to burn the Bagleys' car. *Id*. Sparks went home to avoid missing his curfew. *Id*. at 472 n.3.

2

Vialva, Bernard, and the two other gang members then drove the Bagleys' car (with the Bagleys still in the trunk) and Bernard's car to a remote area on Fort Hood. *Bernard*, 299 F.3d at 472–73. Bernard and another gang member poured lighter fluid on the interior of the Bagleys' car, while the Bagleys sang and prayed in the trunk. *Id.* at 472. Vialva shot the Bagleys with Bernard's gun, killing Todd and rendering Stacie unconscious. *Id.* at 472–73. Bernard then set fire to the car, killing Stacie, who died of smoke inhalation. *Id.* at 473.

A federal jury in Waco found Bernard guilty of carjacking and murder and sentenced him to death for the murder of Stacie Bagley. *Bernard*, 299 F.3d at 473. The Fifth Circuit affirmed, *id.* at 489, and the Supreme Court denied certiorari, 539 U.S. 928 (2003).

**B.      Relevant Trial Testimony on Bernard's Role in the Gang**

During the penalty phase of the trial, Texas Ranger John Aycock testified about the gang's background and structure. *United States v. Vialva et al.*, No. 6:99-CR-70, Doc. 317 at 111-13 (W.D. Tex.).[1] He described both Vialva and Sparks as "climbers" in the 212 PIRU Bloods who attempted to elevate their status in the gang "with their boldness and things that they could do, their plans and their schemes." *Id.* at 114. Aycock testified that, in comparison, Bernard had a lesser role in the gang. *Id.* at 125. Aycock explained that while Vialva was described as the "scary" one in the group, Bernard was merely a "person who would assist and help" other gang members "and not run from a fight." *Id.*

---

[1] Subsequent references to "No. 6:99-CR-70, Doc." refer to docket numbers on this Western District of Texas docket.

at 114, 125. Other witnesses denied that Bernard was a full-fledged member of the gang, testifying that he only "associated" and "hung around" with it.[2] *See, e.g.*, No. 6:99-CR-70, Doc. 312 at 239-40; Doc. 314 at 24, 31, 36, 43, 48-49, 135, 151; Doc. 317 at 110.

### C.    Bernard's Prior Post-Conviction Proceedings

In 2004, Bernard moved to vacate his sentence under § 2255 in the district of conviction. No. 6:99-CR-70, Doc. 377 at 453–608. In his lengthy motion, Bernard argued that he was denied his constitutional rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959). No. 6:99-CR-70, Doc. 416 at 134-41. Bernard did not claim that the government violated *Brady* or *Napue* with respect to the disclosure or presentation of evidence about his role in the gang.

The district court denied Bernard's motion. No. 6:99-CR-70, Doc. 449. The court determined that Bernard's *Brady* and *Napue* claims were procedurally barred and lacked merit. *Id.* at 14–15 & n.1, 22-26. The Fifth Circuit denied Bernard's motion for a certificate of appealability (COA). *United States v. Bernard*, 762 F.3d 467 (5th Cir. 2014), *cert. denied*, 136 S. Ct. 892 (2016).

In 2017, Bernard filed an unauthorized second or successive § 2255 motion, styled as a motion under Federal Rule of Civil Procedure 60(b) for relief from the judgment in his initial § 2255 proceedings. No. 6:99-CR-70, Doc. 569 at 1–63. The district court dismissed the motion for lack of jurisdiction, No. 6:99-CR-70, Doc. 573 at 1, and the

---

[2] Bernard takes issue with the government's characterization of this evidence. Stay Motion 25. Here is a portion of the pertinent testimony: "Q. Okay. Do you know if Mr. Bernard is an actual member of the Two-One-Two or does he associate with them? A. Associates with them."  No. 6:99-CR-70, Doc. 314 at 49.

Fifth Circuit denied a COA, *United States v. Vialva*, 904 F.3d 356, 358 (5th Cir. 2018), *cert. denied*, 140 S. Ct. 859 (2020).

**D.     Tony Sparks's 2018 Resentencing**

Tony Sparks—who was a juvenile at the time of the offense—pleaded guilty to aiding and abetting the carjacking and was sentenced to life imprisonment. *See United States v. Sparks*, 31 F. App'x 156 (5th Cir. 2001). He was resentenced in 2018, after the Supreme Court held that a defendant cannot be sentenced to a mandatory term of life imprisonment without the possibility of parole for an offense committed as a juvenile. *See United States v. Sparks*, 941 F.3d 748, 752–53 (5th Cir. 2019); *Miller v. Alabama*, 567 U.S. 460 (2012).

At Sparks's resentencing, the government called former Killeen Police Department gang investigator Sandra Hunt to testify about Sparks's involvement in the gang and as an expert in gangs. No. 6:99-CR-70, Doc. 656 at 92–95. Hunt was only tangentially involved in the original investigation and was not listed on the government's witness list for Bernard and Vialva's trial. No. 6:99-CR-70, Doc. 225 at 1-6; Doc. 265 at 1–2. Hunt identified Sparks as a member of the gang based in part on a fellow gang member's hand-drawn diagram identifying the gang's members and structure. No. 6:99-CR-70, Doc. 656 at 92–95. This diagram only listed gang aliases, so Hunt's gang unit created a second, nearly identical diagram that also identified the members by their true names. *Id*. at 93–95.

Hunt explained that Sparks was placed on the diagram in a row with "the enforcers or recruiters" for the gang. No. 6:99-CR-70, Doc. 656 at 96–97. Hunt testified that

Sparks's position indicated that he "put in a lot of work" (crime on the gang's behalf) and "became a very trusted member of the group." *Id*. at 98. She further observed that the chart listed Sparks's co-conspirators in the Bagleys' murder, including Vialva and Bernard. *Id*. at 97–98. Hunt stated that Bernard was "at the very bottom of the chart of [the] pyramid . . . about 30 people below Mr. Sparks." *Id*. at 98.

**E.      Bernard's Third § 2255 Motion and Motion for Injunction**

In February 2019, Bernard again sought to vacate his conviction pursuant to § 2255 and, alternatively, Rule 60(b), raising for the first time *Brady* and *Napue* claims based on Hunt's testimony at Sparks's 2018 resentencing and the diagram of the gang's membership. No. 6:99-CR-70, Doc. 661. Under § 2255(h), a "second or successive motion" must be dismissed unless a panel of the court of appeals certifies, as relevant here, that the motion is based on "newly discovered evidence that . . . would be sufficient to establish by clear or convincing evidence that no reasonable factfinder would have found the movant guilty of the offense." 28 U.S.C. § 2255 (h)(1); *see id.* § 2244(b)(3), (4). The district court construed Bernard's motion as a successive § 2255 motion, No. 6:99-CR-70, Doc. 664, and transferred it to the Fifth Circuit. *See United States v. Bernard*, 820 F. App'x 309, 310 (5th Cir. 2020) (per curiam) (unpublished).

The Fifth Circuit affirmed the transfer order with instructions to dismiss the § 2255 petition for want of jurisdiction. *Bernard*, 820 F. App'x at 311.  The court agreed with the district court that Bernard's § 2255 motion was successive.  It reasoned that the "factual predicate for Bernard's claims . . . existed long before Bernard filed his first

habeas petition." *Id.* The Fifth Circuit subsequently denied Bernard's petition for

rehearing *en banc*. Order, No. 19-70021 (Nov. 6, 2020).

In a separate opinion, the Fifth Circuit denied Bernard's motion for authorization

to file a successive § 2255 motion. *In re Bernard*, 826 F. App'x 356 (5th Cir. 2020) (per

curiam). The court held that Bernard's motion to vacate based on the testimony from

Sparks's hearing could not be authorized as a second or successive motion under

§ 2255(h)(1) because that evidence related only to his death sentence, not his guilt. *Id.* at

358. And the court observed that, in any event, "Bernard cannot establish that this

evidence is 'newly discovered.'" *Id.* at 358 n.2. Bernard claimed that the government

"withheld information describing his role in the gang" and "presented false testimony as

to that information," but he "offer[ed] no explanation why he would not have known

what his role in his own gang was" and "all but admit[ted] he had such knowledge." *Id.*

The Fifth Circuit also rejected Bernard's request to recall the mandate of its previous

denial of § 2255 relief, explaining that Bernard's *Brady* and *Napue* claims "were not

previously raised" and that "this court may not recall its mandate to consider a claim that

was not before it during the original proceedings." *Id.* at 359 (quotation omitted).

On October 16, 2020, the government gave notice that it planned to execute

Bernard on December 10, 2020.  No. 6:99-CR-70, Doc. 698.  On November 13, 2020,

Bernard asked the Western District of Texas to enjoin his execution pending a potential

petition for a writ of certiorari.  No. 6:99-CR-70, Doc. 706.  The government opposed

that motion, No. 6:99-CR-70, Doc. 709, and it is still pending.

## APPLICABLE LEGAL STANDARD

A stay of execution is a form of equitable relief in which the standards for a preliminary injunction generally apply. *See Williams v. Chrans*, 50 F.3d 1358, 1360 (7th Cir. 1995). A capital prisoner seeking a stay of execution pending additional legal proceedings bears the burden of demonstrating (1) he will suffer irreparable harm if a stay is not granted; (2) he has a significant likelihood of success on the merits in the pending legal proceedings; and (3) the balance of equities (the harms to the prisoner and the government, as well as the interests of the public at large) weigh in favor of a stay. *Lambert v. Buss*, 498 F.3d 446, 447 (7th Cir. 2007); *see Nken v. Holder*, 556 U.S. 418, 434 (2009).

The Seventh Circuit has established several guidelines for applying the relevant equitable rules to an application for a stay of execution.  First, the requirement that the movant "make a '*strong* showing' of probable success on the merits" is a demanding one—a court may not grant a stay even if it is based on a "significant possibility" of success or a finding "that evaluating [the defendant]'s arguments will take more time." *Lee v. Watson*, No. 19-3399, 2019 WL 6718924, at *1 (7th Cir. Dec. 6, 2019) (unpublished) (quoting *Nken*, 556 U.S. at 434) (emphasis added).  Indeed, the Supreme Court recently vacated a stay of execution for a federal prisoner where the Seventh Circuit had found only that the prisoner's claims were "worthy of further exploration" and that a stay would permit more "time for consideration and deliberation."  *Purkey v. United States*, 964 F.3d 603, 618 (7th Cir.), *stay vacated*, ___ S. Ct. ___, 2020 WL 3988688 (July 15, 2020); *see also Purkey v. United States*, 812 F. App'x 380, 382 (7th

Cir. 2020) (unpublished) (clarifying that, to issue a stay, the likelihood of success must be "strong enough to satisfy *Nken*'s first requirement").

Second, "[t]he prospect of irreparable injury" is "not itself enough" to justify a stay of execution, *Lee*, 2019 WL 6718924, at *1, because irreparable injury is generally taken as a given in capital cases, *Chrans*, 50 F.3d at 1360.

Third, as for the remaining equitable considerations, when a defendant's conviction and sentence have been upheld on direct appeal and collateral review, a court must recognize the government's "strong interest in proceeding with its judgment" and must consider "the extent to which the inmate has delayed unnecessarily in bringing the claim" on which a stay application is based. *Lambert*, 498 F.3d at 452 (quoting *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004)); *see Bucklew v. Precythe*, 139 S. Ct. 1112, 1133-34 (2019) (explaining that "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a [death] sentence" that has been upheld on direct appeal and collateral review, and "[c]ourts should police carefully against attempts to use [further] challenges as tools to interpose unjustified delay") (quotation marks omitted). Because the government has a "significant interest in enforcing its criminal judgments, there is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Lambert*, 498 F.3d at 452 (quoting *Nelson*, 541 U.S. at 650).

## ARGUMENT

## I.     Bernard Cannot Show a Likelihood of Success on the Merits.

Bernard cannot establish that he is likely to succeed on the merits of his § 2241 petition. The saving clause in 28 U.S.C. § 2255(e) prevents Bernard from raising in this Court claims that the Fifth Circuit did not authorize him to pursue in his district of conviction. Section 2255 was not "inadequate or ineffective" to raise those claims simply because § 2255(h)'s limitations on successive motions prevented him from doing so. And even if the saving clause did not foreclose Bernard's petition, he could not show a likelihood of success on the merits of his *Brady* and *Napue* claims.

### A.     Bernard's § 2255 remedy was not ineffective or inadequate to test the legality of his sentence simply because his constitutional claims were barred by § 2255(h)'s limits on successive petitions.

Section 2255 allows a prisoner serving a federal sentence to "move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). A prisoner is ordinarily limited to a single § 2255 motion, and can file a "second or successive" motion only if a panel of the court of appeals certifies that it contains "newly discovered evidence" of the prisoner's actual innocence or relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court." 28 U.S.C. § 2255(h). "In the great majority of cases," § 2255 is the "exclusive postconviction remedy for a federal prisoner." *Purkey v. United States*, 964 F.3d 603, 610 (7th Cir. 2020). The sole exception is found in § 2255(e), known as the "saving clause," *Boumediene v. Bush*, 553 U.S. 723, 776 (2008), or "savings clause," *Bourgeois v. Watson*, 977 F.3d 620, 624 (7th Cir. 2020). The saving clause states that a

petition for a writ of habeas corpus under § 2241 "shall not be entertained" unless the petitioner's remedy under § 2255 "is inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e). The saving clause provides "a narrow route to relief that exists only to prevent fundamental errors that § 2255 could not have corrected." *Bourgeois*, 977 F.3d at 639.

> **1.    Under Seventh Circuit precedent, a constitutional claim can satisfy the saving clause only in very limited circumstances.**

The Seventh Circuit has established that a constitutional claim can satisfy the saving clause only in narrow circumstances not present here. The court first considered the saving clause's contours in *In re Davenport*, 147 F.3d 605 (7th Cir. 1998), which involved appeals by two federal prisoners. The court held that the first prisoner, Davenport, could not use § 2241 to challenge his sentence under the Armed Career Criminal Act, 18 U.S.C. § 924(e), because he could have raised his challenge on direct appeal and in a § 2255 motion. *Davenport*, 147 F.3d at 609. The second prisoner, Nichols, was convicted of violating 18 U.S.C. § 924(c) and unsuccessfully attacked his conviction in a § 2255 motion before the Supreme Court's decision in *Bailey*, which adopted a narrow reading of § 924(c)'s requirement that an offender "use" a firearm during and in relation to a crime of violence. The court determined that § 2255 was inadequate and ineffective to test the legality of Nichols's detention in these circumstances. *Id.* at 610-12. The prisoner was "being held in prison for a nonexistent crime," and he could not have raised his claim on direct appeal or in his first § 2255 motion because of then-binding precedent that *Bailey* later abrogated. *Id.* at 610. Nor

could he raise his claim in a second or successive § 2255 motion because he did not rely on newly discovered evidence of his innocence or a new rule of constitutional law. *Id.* The court determined that "[a] federal prisoner should be permitted to seek habeas corpus only if he had no reasonable opportunity to obtain earlier judicial correction of a fundamental defect in his conviction or sentence because the law changed after his first 2255 motion" and the change is both retroactive and "eludes the permission in section 2255 for successive motions." *Id.*

The Seventh Circuit later clarified that *Davenport* is satisfied only where "(1) the claim relies on a statutory interpretation case, not a constitutional case, and thus could not have been invoked by a successive § 2255 motion; (2) the petitioner could not have invoked the decision in his first § 2255 motion and the decision applies retroactively; and (3) the error is grave enough to be deemed a miscarriage of justice." *Chazen v. Marske*, 938 F.3d 851, 856 (7th Cir. 2019) (internal quotation marks omitted).

The Seventh Circuit has found the saving clause satisfied in only two additional circumstances.  First, in *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001), the defendant was convicted of operating a continuing criminal enterprise and sentenced to death after the jury at his sentencing hearing was presented with evidence about uncharged murders the defendant committed in Mexico. *Id.* at 919-20. After his appeal and § 2255 motion were unsuccessful, he sought relief from the Inter-American Commission on Human Rights. *Id.* at 920. "This was the earliest point at which Garza could seek relief, because the Commission requires the applicants to exhaust national remedies." *Purkey*, 964 F.3d at 612. After the Commission determined that "Garza's death sentence was a violation of

international human rights norms to which the United States had committed itself," *Garza*, 253 F.3d at 920, the defendant sought § 2241 relief on the ground that the United States was bound by treaty to abide by the Commission's decision. *Id.* The Seventh Circuit determined that the saving clause permitted the habeas petition because "it was literally impossible for [the defendant] to have raised [his claim] at any time earlier than . . . the date of the Commission's decision," and "[t]he argument therefore could not have been raised in his direct appeals or in his first § 2255 motion." *Id.* at 922-23. The court ultimately concluded, however, that the Commission's decision was not binding, and it denied a stay of execution. *Id.* at 925-26.

Second, in *Webster v. Daniels*, 784 F.3d 1123, 1124-25 (7th Cir. 2015) (en banc), the defendant was convicted of kidnapping resulting in death and sentenced to death. The defendant unsuccessfully sought relief under § 2255 based on *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that the Eighth Amendment "prohibits the execution of the intellectually disabled." *Webster*, 784 F.3d at 1132. After his § 2255 motion was denied, he obtained new evidence in support of his intellectual-disability claim that existed at the time of his trial but had been unavailable to him because of missteps by the Social Security Administration. *Id.* at 1132-34. Because the defendant could not satisfy § 2255(h)'s requirements for a second or successive motion, he sought relief under § 2241. *Id.* at 1134-35. The Seventh Circuit held that the saving clause did not bar a claim that a prisoner is "categorically ineligible for the death penalty, based on newly discovered evidence." *Webster*, 784 F.3d at 1140. "But this rule cannot apply to all newly discovered evidence," the Court explained, "or else there would never be any finality to

13

capital cases." *Id.* To avoid "concerns about creating too large an exception to the exclusivity of section 2255," the court limited its holding to newly discovered evidence that "existed before the time of the trial" and that was unavailable "despite diligence on the part of the defense," not because of "missteps by" the defense. *Id.* (emphasis omitted); *see id.* at 1141 (defendant must present "previously existing evidence . . . that counsel did not uncover despite diligent efforts"). The court anticipated that it will be a "rare case" in which these conditions are satisfied. *Id.* at 1140.

The Seventh Circuit has rejected further expansion of the saving clause in several recent capital cases. In *Purkey v. United States*, 964 F.3d 603, 614-15 (7th Cir. 2020), the defendant argued that § 2255 was inadequate or ineffective to test the legality of his death sentence because his counsel in the § 2255 proceedings rendered ineffective assistance The court disagreed, concluding that "the words 'inadequate or ineffective,' taken in context, must mean something more than unsuccessful." *Id.* at 615. That is, "there must be a compelling showing that . . . it would be impossible to use section 2255 to cure a fundamental problem. It is not enough that the proper use of the statue results in denial of relief." *Id.*

In *Lee v. Watson*, 964 F.3d 663, 667 (7th Cir. 2020), the defendant sought to use the saving clause to raise a claim that his § 2255 counsel had missed. *Lee* reaffirmed *Purkey*'s "unambiguous[ ]" holding that "a § 2241 petitioner may not proceed under the Savings Clause absent 'a compelling showing' that it was 'impossible' to use § 2255 to cure the defect identified in the § 2241 petition." *Id.* at 666 (quoting *Purkey*, 964 F.3d at

615). The court held that *Lee*'s claims of ineffective assistance of counsel, as well as his claims under *Brady* and *Napue*, could not satisfy the saving clause. *Id.* a 667.

In *Bourgeois*, the court held that the defendant could not use § 2241 to raise an intellectual disability claim under *Atkins*. *Bourgeois*, 977 F.3d at 639. The court observed that "*Atkins* was on the books when Bourgeois filed his § 2255 motion" and that "the § 2255 court set forth, and applied, the same three-part test for intellectual disability that now prevails." *Id.* Although "some aspects of the court's analysis would have looked different" in light of recent Supreme Court cases, the "savings clause does not apply every time the Supreme Court clarifies the law that governed a prisoner's § 2255 motion, or, where intellectual disability is at issue, every time the medical community updates its diagnostic standards." *Id.*

In several additional cases, the Seventh Circuit has rejected arguments that the saving clause allows § 2241 motions raising the following claims: (a) ineffective assistance of counsel based on a prosecutor with a conflict of interests, *Vialva v. Watson*, 975 F.3d 664, 666 (7th Cir. 2020) (per curiam), (b) that kidnapping resulting in death is not a crime of violence under § 924(c), *Hall v. Watson*, 2020 WL 6779345, at *2 (7th Cir. Nov. 18, 2020); (c) that African-Americans were improperly struck from a capital jury, *Hall v. Watson*, 2020 WL 6791487, at *1 (Nov. 19, 2020), and (d) that the death penalty is applied in a racially disproportionate manner, *id.*

2.      **Bernard's *Brady* and *Napue* claims cannot satisfy the saving clause.**

Bernard's constitutional claims do not fall within the narrow categories of claims that the Seventh Circuit has concluded are permitted under the saving clause. The Seventh Circuit has "unambiguously" held that "a § 2241 petition may not proceed under the Savings Clause absent 'a compelling showing' that it was 'impossible' to use § 2255 to cure the defect identified in the § 2241 petition." *Lee*, 964 F.3d at 666 (quoting *Purkey*, 964 F.3d at 615).  "It is not enough that proper use of the statute results in denial of relief."  *Purkey*, 964 F.3d at 615.

Bernard contends that his claims fall "squarely within the savings clause" because he has identified a "fundamental problem" with his sentence and there is "something structurally inadequate or ineffective about section 2255 as a vehicle" to cure that problem. Stay Motion 29-30 (quoting *Purkey*, 964 F.3d at 615, and *Bourgeois*, 977 F.3d at 636 (internal quotation omitted)).  He is incorrect.

Bernard's *Brady* and *Napue* claims—even if they had merit—are not the sort of "fundamental problem[s]" that *Purkey* contemplated.  *Purkey* used that term to summarize the defects alleged in *Davenport*, *Garza*, and *Webster*. *Purkey*, 964 F.3d at 614-15. Specifically, those defects were "having been imprisoned for a non-existent offense" (*Davenport*), being sentenced to death in "violation of international human rights norms to which the United States had committed itself" (*Garza*), and being "categorically ineligible for capital punishment under the Supreme Court's decision in *Atkins*" (*Webster*).  *Id.* at 612-14 (quotations omitted). Unlike the claimants in those

16

cases, Bernard does not claim that a statutory or constitutional problem makes him "categorically ineligible for the death penalty." *Webster*, 784 F.3d at 1140. Instead, he argues that additional evidence about his role in the gang might have affected the jury's evaluation of aggravating and mitigating factors and caused the jury to not impose the death sentence. That does not fit within the narrow class of constitutional claims that can be brought under *Webster*.

Nor can Bernard show that "there is something structurally inadequate or ineffective about section 2255 as a vehicle" to raise his *Brady* and *Napue* claims. Stay Motion 30 (quotation omitted). He complains that, once his initial § 2255 motion "was complete, there was no mechanism under § 2255 to litigate the sentencing-phase *Brady/Napue* violations that came to light in 2018." Stay Motion 30. That fact is simply a function of § 2255(h), which requires that successive motions be based either on new evidence of actual innocence or a new rule of constitutional law made retroactive by the Supreme Court. The Seventh Circuit has held that § 2255(h)'s limitations on second or successive motions are not a structural problem that triggers the saving clause. *See Unthank v. Jett*, 549 F.3d 534, 535 (7th Cir. 2008) (rejecting a claim that "§ 2255 is inadequate an ineffective" when "§ 2255(h) blocks a successive petition"). As multiple circuits have recognized, such a reading of the statute would make § 2255(h)'s limitations a "meaningless gesture" and would "recreate the serious structural problems that led Congress to enact § 2255 in the first place." *United States v. Barrett*, 178 F.3d 34, 50 (1st Cir. 1999). *See, e.g., Farkas v. Butner*, 972 F.3d 548, 559 (4th Cir. 2020) ("[A]llowing a § 2241 application for a constitutional claim that does not fit within the narrow confines

of § 2255(h)(2) would read § 2255(h)(2)'s gatekeeping provisions right out of the statute."); *Davenport*, 147 F.3d at 608 (observing that treating the "new limitations" on the "filing of successive 2255 motions" as allowing a prisoner to "turn to 2241" would "nullify the limitations). Section 2255(h)'s limitations are not a structural defect that allows Bernard to use the saving clause.

Bernard also argues that his § 2255 remedy is inadequate or ineffective based on the nature of his *Brady* claim itself. He argues that "when the government has successfully hidden such information throughout the pendency of an initial § 2255 motion, there is 'something structurally inadequate or ineffective about section 2255 as a vehicle'" to cure the problem.  Stay Motion 30 (quotation omitted). But that is just another way of arguing that § 2255(h)'s limits on successive motions render § 2255 inadequate or ineffective.

In *Webster*, the court concluded that because the Supreme Court had not decided that the Eighth Amendment barred execution of minors or the intellectually disabled at the time that Congress enacted § 2255(h)'s restrictions on second or successive motions, there was reason to construe the saving clause to permit habeas petitions raising those claims based on newly-discovered evidence. *See* 784 F.3d at 1139. *Brady* and *Napue*, however, are longstanding decisions, defendants have long raised *Brady* and *Napue* claims based on newly discovered evidence, and Bernard himself raised *Brady* and *Napue* claims in his first § 2255 motion. Moreover, a court of appeals can authorize a successive § 2255 motion based on newly discovered evidence only where that evidence, if credited, would establish the defendant's innocence by "clear and convincing

evidence." 28 U.S.C. § 2255(h)(1). Thus, defendants may raise *Brady* and *Napue* claims based on newly discovered evidence in second or successive § 2255 motions, but only if they present compelling evidence of their innocence. *See United States v. Buenrostro*, 638 F.3d 720, 725 (9th Cir. 2011) (per curiam). Allowing the *Brady* and *Napue* claims that Bernard asserts in this case to proceed under the saving clause would circumvent those congressionally mandated limitations.

Bernard also makes much of the fact that it was the government's alleged misconduct that prevented him from bringing his claims earlier. *See* Stay Motion 31 ("The government's misconduct succeeded in denying Mr. Bernard the one full and fair round of collateral review that § 2255 contemplates and the Constitution guarantees."), 33 ("[I]t was the government's unconstitutional actions, rather than any fault of Mr. Bernard's that closed the courthouse doors."). As explained below, the government did not suppress material evidence or elicit false evidence. But Bernard's allegations that someone else bears responsibility for his failure to raise these claims earlier would not, in event, show any structural problem with § 2255. In *Purkey*, the prisoner similarly argued that his § 2255 motion omitted claims through no fault of his own, but because of ineffective assistance by his § 2255 counsel. *Purkey*, 964 F.3d at 615. But the Seventh Circuit held that he could not satisfy the saving clause because nothing in § 2255 "formally prevented him from raising" those claims in a first § 2255 motion. *Id.*

If Bernard were correct that the saving clause is available whenever an alleged *Brady* violation comes to light after a first § 2255 claim has been litigated, there would be effectively no limits on the timing or number of *Brady* claims that a defendant might

raise. To the government's knowledge, no other court has accepted such a broad reading of § 2255(e), and this Court should not be the first.

In any event, the Seventh Circuit has specifically held that a "*Brady/Napue* claim" does not satisfy the saving clause where "the alleged 'newly discovered' evidence on which the claim rests was known to [the defendant]" and contained in records that were "available with reasonable diligence." *Lee*, 964 F.3d at 667. In this case, the Fifth Circuit has already determined that "Bernard cannot establish that [the allegedly suppressed] evidence is 'newly discovered.'" *Bernard*, 826 F. App'x at 358 n.2. That determination is likely law of the case. *See Webster*, 784 F.3d at 1135 n.5 (treating the Fifth Circuit's ruling on Webster's application to file a successive Section 2255 motion as "law of the case, both in recognition of its unreviewability and out of respect for our sister circuit"). It is also correct. As explained below, Bernard's own role within his gang was "know to [Bernard]," the handwritten chart with the gang's structure was provided to the defense, and Sandra Hunt's opinion about Bernard's role was either an inference that could be argued directly from the chart or an opinion that could be obtained from *some* witness "with reasonable diligence." *Lee*, 964 F.3d at 667. This Court need do no more than accept the Fifth Circuit's determination that Bernard's claim does not rest on "newly discovered" evidence and hold that it is barred by the saving clause under *Lee*. Because Bernard cannot avail himself of the saving clause, he cannot show a likelihood of success in his pending § 2241 motion.

**B.** **Bernard's *Brady* and *Napue* claims lack merit.**

Even if Bernard could satisfy the saving clause, he could not show a substantial

likelihood of success on the merits on his *Brady* and *Napue* claims, which are baseless.

**1.** **The government did not suppress evidence.**

A crucial predicate for any *Brady* claim is that the evidence at issue was not

"disclosed to the defense." *Strickler v. Greene*, 527 U.S. 263, 280 (1999). Here, however,

the government made its file fully available to Bernard's and Vialva's trial counsel for

inspection. Doc. 34 at 1; Doc. 36 at 1; Doc. 449 at 25; Doc. 320 at 33. As part of this

disclosure, the hand-drawn gang diagram was disclosed to the defense and was even

included in the government's exhibit list. Doc. 266 at 9 ("Diagram depicting the members

of the 212 PIRU Bloods"). Bernard's claim that "there is no evidence that the

handwritten chart was provided" in discovery, Stay Motion 21 n.24, is baseless. And, in

any event, it would be *his* burden to show that the evidence was not provided, and he

could not satisfy that burden if there was "no evidence" pointing in either direction.

While not fully conceding that the hand-drawn chart was produced, Bernard

focuses his *Brady* claim on the government's alleged suppression of Sandra Hunt's

"expert opinion[ ]" that "that the 212 PIRU Bloods had a hierarchical organization and

that Mr. Bernard was at its very bottom." Stay Motion 11. But Bernard cannot show that

the government suppressed that evidence, much less that it was material. Hunt did not

testify about the gang chart until 18 years after Bernard's trial, and the government could

not improperly suppress an expert opinion that had not yet been given.

Bernard contends, however, that the government suppressed Hunt's opinion at the 2000 trial because it "consulted" with Hunt before trial, Stay Motion 22-23, and because Hunt "briefed the federal prosecutors concerning her conclusions that the 212 PIRU Bloods had a hierarchical organization and that Mr. Bernard was at its very bottom," *id.* at 11. His only support for these factual claims is the following exchange between the trial prosecutor and Hunt at Sparks's resentencing hearing:

> Q.    All right. Did you at my request look to see if there were other gang individuals - - let me back up.
>         You're familiar with the incident that took place on June 21, 1999 in Killeen where Todd and Stacie Bagley were kidnapped and murdered?
>
> A.    I am.
>
> Q.    Did you, at that time, at our request, go back and see if any of the identities of any of the other people who were involved in that were on this chart?
>
> A.    Yes, I did.

No. 6:99-CR-70, Doc. 656 at 97 (App. 226). Hunt proceeded to testify that she had "locate[d]" several of the defendants on the chart, including Vialva, Terry Brown, Bernard, and Sparks. *Id.* at 97-98.

Hunt did not testify that she told the prosecutor anything prior to Bernard's 2000 trial—much less that she "briefed" him "concerning her conclusions that the 212 PIRU Bloods had a hierarchical organization and that Mr. Bernard was at its very bottom." Stay Motion 11. She testified merely that, at the prosecutor's request (presumably in 1999 or 2000), she had "go[ne] back" to see if anyone involved in the Bagleys' murder was "on this chart." No. 6:99-CR-70, Doc. 656 at 97. Hunt's confirmation that several of the

murderers were on the chart may have been what prompted the government to disclose

the chart and to list it as an exhibit for the 2000 trial. But this brief exchange at Sparks's

sentencing does *not* show that the government was aware at the time of Hunt's opinions

about the gang's structure.[3]

Even assuming—as Bernard speculates—that Hunt "briefed" the government

regarding her views, Stay Motion 11, the government had no duty to disclose her opinion.

Hunt was only tangentially involved in the original investigation, and the government had

no reason to call her as a witness. At most, her opinion merely confirmed what was

obvious from the handwritten chart—that the gang had a pyramid structure and that the

member of the gang who drew the chart had placed Bernard at the bottom. Bernard had

received the chart, and he could have introduced it into evidence and called his own gang

expert to opine that it showed he was at the bottom of the gang hierarchy.

Moreover, the government had no duty to disclose information to Bernard about

his own status in the gang. *See United States v. Vasquez-Hernandez*, 924 F.3d 164, 171

(5th Cir. 2019) (explaining that government "bears no responsibility to direct the defense

toward potentially exculpatory evidence that is either known to the defendant or that

could be discovered through the exercise of reasonable diligence") (citing *United States

v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004)). As the Fifth Circuit noted, Bernard's own

knowledge of his gang status would undermine his *Brady* claim even if it were not barred

---

[3] Bernard's repeated claim that the government failed to abide by its promise of open-file discovery, Stay Motion 2-3, 16-17, 32, 37, finds no support in the record. Even Bernard has never suggested that the government's consultation with Hunt produced any files that could have been disclosed.

by § 2255(h). *Bernard*, 826 F. App'x at 358 n.2 ("Bernard offers no explanation why he would not have known what his role in his own gang was. . . . Indeed, Bernard all but admits he had such knowledge"). Even if Bernard were correct that the government was aware of Hunt's opinions, he cannot show that the government suppressed any favorable evidence that was not already known to him.

Bernard also suggests that the second chart used at Sparks's resentencing, which showed the gang members' full names, somehow contained *Brady* material. Stay Motion 12 n.18. He describes that document as "replac[ing] the gang members' nicknames with their true names, based on confidential information in KPD gang intelligence files." Stay Motion 10-11. In fact, the second chart "replaced" names of only a few members; most of the changes consisted of adding the last names of members identified only by their first names on the handwritten chart. *Compare* App. 303 *with id.* 304. More importantly, the only possible value of either chart as potential mitigation evidence during the penalty phase was to show that Bernard was at the bottom of the pyramid, below others such as Vialva, Sparks, and another co-defendant in this case, Terry Brown.  And that fact was evident from the original, handwritten chart. *See* App. 303 (chart), 337 (trial testimony identifying Bernard as "Dip"). The second chart, regardless of when it was created, added nothing new in that respect. Bernard cannot show that the government suppressed any favorable evidence.

### 2.      The allegedly suppressed evidence was not material.

In any event, the evidence allegedly suppressed was not material. "[F]avorable evidence is material . . . if there is a 'reasonably probability' that, had the evidence been

disclosed to the defense, the result of the proceedings would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citation omitted). Bernard cannot show that Hunt's opinions about what the chart showed would have added anything to the chart itself or would have caused the jury to recommend a sentence of life imprisonment.

Bernard first asserts that the evidence was material because "[t]he unconditional expert opinion of a highly qualified law enforcement officer that there was in fact a detailed hierarchy would have done far more to contradict the government's repeated evidence—insisting that there was no hierarchy—than a few isolated comments from random lay witnesses." Stay Motion 24. This is incorrect for several reasons.

First, contrary to Bernard's claim, the government did not "insist[ ] that there was no hierarchy." *Id.* Indeed, the government said nothing about the gang's structure in its opening statements or closing arguments at either trial phase. *See* No. 6:99-CR-70, Doc. 311 at 10-26; Doc. 316 at 6-23, 87-112; Doc. 317 at 4-9; Doc. 319 at 17-28, 64-95. And the evidence from the government's witness indicated that the gang eschewed titles, but nevertheless had some form of hierarchy. Texas Ranger John Aycock testified that the Presley family was "at the top of a matrix of this group."[4] No. 6:99-CR-70, Doc. 317 at 111. He further testified that his "understanding" was that the founders of the 212 PIRU Bloods in Killeen "didn't particularly want it to [be] where one person was above another with some sort of title, because they didn't want to cause problems in a newly-formed

---

[4] This was consistent with Hunt's testimony that the three Presley brothers (including "Phat") were the "originators" of the 212 PIRU Bloods. No. 6:99-CR-70, Doc. 656 at 96.

gang." No. 6:99-CR-70, Doc. 317 at 113 (App. 395). He testified that because of these problems with a "pyramid scheme," the gang's founders "chose not to have any titles, is my understanding." *Id.* But Aycock also testified that Vialva and Sparks were "climbers" who "cause[d] some problems" by trying to make names for themselves. *Id.* at 114.

The gang's members also painted a complicated picture of its structure. Terry Brown, a member of an affiliated gang who participated in the Bagleys' murders, testified that there were no "leaders" in the 212 PIRU Bloods because "everyone was considered equal." No. 6:99-CR-70, Doc. 312 at 226; Doc. 317 at 95. But two 212 PIRU members indicated that the gang had a "leader" or "crown holder," though they "d[id]n't know" who that person was. No. 6:99-CR-70, Doc. 314 at 17-18 (testified that he did not know who the leader was because he "wasn't into it like that" but also testifying that every gang has a "crown holder"), 225 ("I don't know the exact person, sir."). A witness who associated with the gang testified that someone named "Fat" was the gang's "leader" or "crown holder."  No. 6:99-CR-70, Doc. 314 at 64. And a witness testified that Vialva was "in charge" during the gang's attempted carjacking the night before the murders, No. 6:99-CR-70, Doc. 311 at 86, indicating a *de facto* hierarchy within the gang. Thus, the evidence indicated at least some kind of hierarchy, and the government did not argue otherwise to the jury.

Second, Bernard's assertion that Hunt's expert opinion would have been more persuasive to the jury than the testimony of the gang's actual members is questionable at best. Because of the danger that jurors will give experts too much weight, courts often give cautionary instructions about their testimony. And a jury could reasonably conclude

that the actual members of a gang were more likely to understand its structure than would an expert based on her general knowledge of gangs and on a handwritten chart obtained from a student at a local school. *See* No. 6:99-CR-70, Doc. 656 at 92-93.

Third, the government's alleged suppression of Hunt's opinion did not prevent Bernard from introducing the handwritten chart into evidence or from calling his own gang expert to testify about the gang's structure. Bernard had received the chart in discovery before trial, and nothing prevented him from making the same arguments about his role in the gang that he makes now. The government had no duty to point him to a gang expert.

Bernard also asserts that Hunt's opinion was material because "in urging the jury to impose a death sentence, [the government] argued that Bernard's strong connection to the gang meant that he would remain dangerous for years to come if not executed." Stay Motion 1; *see id.* at 12-13. Bernard does not give any citation for this supposed argument. And, in fact, the government based its argument regarding future dangerousness on Bernard's past crimes, not his gang affiliation. *See* No. 6:99-CR-70, Doc. 319 at 26-27, 78-79. Although the government argued that Vialva wanted to be "top gangster in Killeen" and that Bernard "assist[ed] in that," *id.* at 73, it never argued, as Bernard claims, that "because of his connection to the gang, he was sure to commit acts of violence for the rest of his life." Stay Motion 12-13. More importantly, the government never argued that Bernard's *role* in the gang made him dangerous. Thus, evidence that he was at the bottom of the gang's hierarchy would not have affected the government's penalty-phase arguments.

Ultimately, Bernard cannot show that Hunt's opinion about his role in the gang hierarchy would have any effect on the outcome. The jury already heard testimony that Bernard had a marginally lesser role than his co-defendant Vialva and that Bernard was a "person who would assist and help." No. 6:99-CR-70, Doc. 317 at 125. The jury heard, for example, that Vialva took a leadership role during the offense, including planning the carjacking with Sparks (No. 6:99-CR-70, Doc. 312 at 175-76); recruiting Bernard to participate (No. 6:99-CR-70, Doc. 314 at 149, 150-51, 153); selecting the gang member who would ask the Bagleys for a ride (Doc. 312 at 175); pulling out the gun and pointing it toward Todd Bagley's head (Doc. 314 at 158); demanding Todd Bagley's wallet (Doc. 314 at 159); threatening to kill the Bagleys if they did not provide the correct PIN number (Doc. 314 at 165-66); making the decision "to burn the car and kill the people" (Doc. 312 at 192-93; Doc. 314 at 179-80); instructing Bernard to get the accelerant to "burn the car" (Doc. 312 at 194, 195-96, 200); directing another gang member to open the trunk (Doc. 312 at 211); and shooting Todd Bagley in the head (Doc. 312 at 213-14). Bernard's counsel argued during the penalty phase that this testimony demonstrated that Bernard was less culpable than Vialva and Sparks, No. 6:99-CR-70, Doc. 319 at 61, and the jury nonetheless imposed a capital sentence.

Hunt's 2018 testimony that Bernard was "at the very bottom of the chart"—a chart that Bernard could have introduced at trial—would have added little to this evidence. No. 6:99-CR-70, Doc. 656 at 98. Moreover, Hunt's testimony about Bernard's role in the gang would not have undercut the evidence about his role *in the offense*—*i.e.*, that he willingly agreed to participate in the carjacking, that the weapon used to carjack and

shoot the Bagleys belonged to him, that he bought lighter fluid with the money Vialva gave him, that he helped pour lighter fluid in the Bagley's car while the Bagleys were held captive in the trunk, that Stacie Bagley died from the resulting fire, or that Bernard provided and drove the getaway car. Bernard cannot demonstrate that the nominal evidence about the gang's structure offered at Sparks's resentencing would have materially affected the jury's sentence. Accordingly, even if his motion were not barred on procedural grounds by the saving clause, Bernard could not show that his *Brady* claim has any merit.

### 3.   The government did not introduce false testimony in violation of *Napue*.

Bernard's *Napue* claim would also fail. Under *Napue*, the government "may not knowingly use false evidence" to obtain a conviction. *Napue*, 360 U.S. at 269. As detailed above, nothing in Hunt's testimony at Sparks's resentencing undermined the trial evidence or suggested that the government introduced false evidence relating to Bernard's role in the gang. And any alleged *Napue* error would be harmless in any event, in light of the ample evidence that Bernard was not a leader in the gang but nevertheless played a substantial role in the Bagleys' murders.

## II.   The Balance of the Equities Weighs in the Government's Favor.

The balance of the equities weighs against granting a stay.  That Bernard faces irreparable harm is not dispositive; otherwise, no death sentence would ever be enforced. *See Chrans*, 50 F.3d at 1360.  And although Bernard did not unreasonably delay in bringing his § 2241 motion, the Fifth Circuit has already concluded that the basis for his

alleged *Brady* claim is not "newly discovered," rendering any further delay in carrying out Bernard's sentence unnecessary.

In considering the public interest, *see Nken*, 556 U.S. at 434, the Supreme Court has repeatedly emphasized that "[b]oth the [government] and the victims of crime have an important interest in the timely enforcement of a sentence." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1133 (2019) (quoting *Hill v. McDonough*, 547 U.S. 573 584 (2006)); *see, e.g.*, *Nelson v. Campbell*, 541 U.S. 637, 650 (2004) (describing "the State's significant interest in enforcing its criminal judgments"); *Gomez v. District Court*, 503 U.S. 653, 654 (1992) (per curiam) (noting that "[e]quity must take into consideration the State's strong interest in proceeding with its judgment"). Once post-conviction proceedings "have run their course," as they have here, "finality acquires an added moral dimension." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). Consequently, delay "inflict[s] a profound injury to the 'powerful and legitimate interest in punishing the guilty,' an interest shared by the State and the victims of crime alike." *Id.* (quoting *Herrera v. Collins*, 506 U.S. 390, 421 (1993) (O'Connor, J., concurring)). Unduly delaying executions can also frustrate the death penalty by undermining its retributive and deterrent functions. *See Bucklew*, 139 S. Ct. at 1134; *id.* at 1144 (Breyer, J., dissenting).

The government's interest in implementing Bernard's sentence is magnified by the "heinous" nature of his crimes. After listening to the Bagleys beg for their lives, Bernard bought lighter fluid and set fire to the car, burning Stacie Bagley alive. His death sentence has been upheld throughout his many years of direct and post-conviction review. The balance of equities therefore tips strongly in the government's favor.

## CONCLUSION

For the foregoing reasons, this Court should deny Bernard's stay motion.

Respectfully submitted
JOHN C. CHILDRESS
Acting United States Attorney

By: <u>s/ Joseph H. Gay, Jr.</u>
JOSEPH H. GAY, JR.
Special Assistant United States Attorney
601 NW Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7100
joseph.gay@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court

for the United States District Court for the Southern District of Indiana using the

CM/ECF system on November 30, 2020. I certify that all participants in the case are

registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Joseph H. Gay, Jr.
JOSEPH H. GAY, JR.