UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| BRANDON BERNARD, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )   No. 2:20-cv-00616-JRS-DLP |
| | ) |
| T.J. WATSON, | ) |
| | ) |
| Respondent. | ) |

**Order Denying Motion to Stay Execution**

Brandon Bernard is a federal prisoner scheduled for execution on December 10, 2020. He was sentenced to death in 2000 for his role in the murder of Todd and Stacie Bagley. He has unsuccessfully challenged his convictions and death sentence on direct appeal and in post-conviction litigation. Now he brings a petition for writ of habeas corpus under 28 U.S.C § 2241 and a motion to stay execution, both arguing that he has discovered new evidence of *Brady* and *Napue* violations committed at trial. Because Mr. Bernard cannot show a strong likelihood of success on his habeas corpus petition, his motion to stay execution is denied.

### I.   Background

#### A.   Mr. Bernard's Crimes

The following summary relies on the Fifth Circuit's opinion on direct appeal. *United States v. Bernard*, 299 F.3d 467 (5th Cir 2002) ("*Bernard I*").

Christopher Vialva, Christopher Lewis, Tony Sparks, Terry Brown, and Mr. Bernard were members of the 212 Piru Bloods street gang in Killeen, Texas. On June 21, 1999, Mr. Vialva, Mr. Lewis, and Mr. Sparks recruited Mr. Bernard and Mr. Brown for a robbery plot. The plan was to ask someone for a ride, enter the victim's vehicle, then pull a gun, rob the victim, and then force

the victim into the trunk before abandoning the vehicle in a remote area. Mr. Bernard provided a gun and transportation.

On the afternoon of June 21, Mr. Bernard drove the group around Killeen, where they eventually spotted Mr. Bagley using a pay phone. Mr. and Mrs. Bagley were youth ministers from Iowa. Mr. Bagley had previously served in the Army at Fort Hood near Killeen, and the couple were visiting friends and their former church.

Mr. Lewis and Mr. Sparks approached Mr. Bagley and asked for a ride to their uncle's house. After Todd agreed, Mr. Lewis, Mr. Sparks, and Mr. Vialva entered the Bagleys' car. Mr. Vialva began giving directions but then pulled out a .40-caliber gun (provided by Mr. Bernard), pointed it at Mr. Bagley, and told him that "the plans have changed." At the same time, Mr. Sparks pointed a .22-caliber handgun at Mrs. Bagley.

True to plan, Mr. Vialva ordered the Bagleys out of their car, where the three men stole the Bagleys' jewelry, Mr. Bagley's wallet, and Mrs. Bagley's purse. Mr. Vialva obtained the Bagleys' ATM card pins and then forced them into the trunk.

With the Bagleys in the trunk, Mr. Vialva drove around for several hours. He withdrew a little money using the Bagleys' ATM cards—not much was available—tried to pawn Mrs. Bagley's wedding ring, ate some Wendy's, and bought cigars and cigarettes. At some point, Mr. Vialva decided that they needed to kill the Bagleys and burn the car. Later in the afternoon, Mr. Bernard and Mr. Brown reunited with the group. Mr. Vialva reasserted his plan to kill the Bagleys and burn the car. Mr. Bernard and Mr. Brown purchased lighter fluid for the fire.

Mr. Vialva, Mr. Bernard, Mr. Lewis, and Mr. Brown drove the Bagleys' car to an isolated spot on the Fort Hood military reservation. They parked the car, and Mr. Bernard poured lighter fluid inside it while the Bagleys sang and prayed in the trunk. At Mr. Vialva's instruction,

Mr. Lewis opened the trunk. Mr. Vialva shot each victim once in the head, and Mr. Bernard then set fire to the car. An autopsy showed that Mr. Bagley died from the gunshot wound but Mrs. Bagley died from smoke inhalation.

The four men left in Mr. Bernard's car, but their getaway was short lived because the car slid off the road into a muddy ditch. Law enforcement officers arrived to deal with the fire, and they saw the men pushing the car out of the ditch. When firefighters found the Bagleys' bodies, the four men were arrested.

### B.  Trial, Sentencing, Direct Appeal, and Initial Motion to Vacate

Mr. Vialva and Mr. Bernard were tried together in the Western District of Texas. The jury convicted Mr. Bernard of carjacking, conspiracy to commit murder, and two counts of murder.

At sentencing, the government presented evidence of Mr. Bernard's gang activities with the 212 Piru Bloods. *See*, *e.g.*, *United States v. Bernard*, 6:99-cr-00070-ADA-2, dkt. 317 at 76−77 (W.D. Tex.) (Special Agent Dan Chadwick testifying about Mr. Bernard's involvement in a gang-related fight a few months before the Bagley murders). The government also presented evidence that Mr. Bernard's gang membership made him likely to commit future acts of violence, even if sentenced to life imprisonment. *See*, *e.g.*, *id.*, dkt. 318 at 238 (Dr. Richard Coons testifying, "If they're a member of a gang on the outside, they'll be a member of the gang inside."); *id.* at 244−46 (Tony Davis testifying about how gangs—and specifically Bloods gangs—contribute to prison violence).

Mr. Brown testified that the 212 Piru Bloods maintained a non-hierarchical structure. *Id.*, dkt. 317 at 98 (testifying that "everyone was considered equal" because "crown holders or any other forms of levels . . . caused too much confrontation"). But the government also presented testimony from Ranger John Aycock that Mr. Vialva was "a climber" who was "trying to impress"

the other gang members, "and that would have caused and did cause some problems with some of the other people." *Id.* at 114. On cross-examination, Ranger Aycock testified that Mr. Vialva was the "brains" and the "scary" one of the group. *Id.* at 114−15, 125. In contrast, he described Mr. Bernard as a "person who would assist and help and would not run from a fight." *Id.* at 125.

In closing arguments, the prosecutor described Mr. Vialva as ambitious and the driving force behind the Bagley murders, but he also suggested that Mr. Bernard, like Mr. Vialva, wanted to be a "top dog" and "top gangster":

> [Mr. Vialva] wanted complete power, complete control, and he had it, and he was going to show it off. Just like a little boy who tortures a frog, who is very pleased with the pain that he caused the frog, he wanted some recognition, Mr. Vialva did, in this case from his gang. He wanted to be the top gangster in Killeen. You need to recognize him for that. And you need to recognize Brandon Bernard for his assistance in that. Because if they want to be the top dogs and be the top gangsters, then give them the recognition that's earned them their seats right here in the courtroom.

*Id.*, dkt. 319 at 73.

On the first day of sentencing deliberations, the jury recommended that Mr. Bernard be sentenced to life imprisonment for carjacking, conspiracy to commit murder, and the murder of Mr. Bagley. On the second day of deliberations, the jury recommended that Mr. Bernard be sentenced to death for Mrs. Bagley's murder. *See Bernard I*, 299 F.3d at 473. The district court imposed the same sentences.[1] *Id.* On direct appeal, the Fifth Circuit affirmed. *Id.* at 489.

Mr. Bernard filed a motion to vacate pursuant to 28 U.S.C. § 2255 arguing, among other things, that the government suppressed evidence about witness Terry Brown's criminal history, prior inconsistent statements, drug use, and mental health. *See United States v. Bernard*, 762 F.3d 467, 480−82 (5th Cir. 2014) ("*Bernard II*"). The district court denied relief, and the Fifth Circuit

---

[1] Mr. Vialva was sentenced to death on three counts. Mr. Brown, Mr. Lewis, and Mr. Sparks were juveniles at the time of the crimes—unlike Mr. Bernard, who was 18 years old—and were therefore ineligible for the death sentence.

4

denied a certificate of appealability in August 2014. *Id.* at 483. The district court later dismissed a purported Rule 60(b) motion for relief from judgment as a successive § 2255 motion. *United States v. Bernard*, No. 6:99-cr-00070-ADA, dkt. 571 (W.D. Tex. Dec. 20, 2017).

### C. Successive Motion to Vacate and Petition for Habeas Corpus

In February 2018, at a resentencing hearing for Mr. Sparks, Sandra Hunt testified about the structure of the 212 Piru Bloods. Sergeant Hunt, a former supervisor of the Killeen Police Department's gang unit, testified that in 1998 the gang unit received a piece of paper on which a Killeen high school student had drawn a pyramid with the first names (or in some cases nicknames) of more than 40 apparent 212 Piru Bloods members. Dkt. 3 at 225−26 (testimony of Sandra Hunt); *id.* at 305 (student diagram). The gang unit clerk cross-referenced those names and nicknames with the gang unit's database to create another pyramid-shaped diagram, this one with full names. *Id.* at 246; *see id.* at 306 (police diagram). Based on these diagrams, Sergeant Hunt testified that Mr. Bernard was "at the very bottom of the . . . pyramid," several rows below Mr. Vialva, Mr. Sparks, and Mr. Brown. *Id.* at 248.

The government had made the student diagram available to Mr. Bernard before trial as part of its "open file policy" and mentioned it in a list of potential trial exhibits. *United States v. Bernard*, No. 6:99-cr-70-ADA, dkt. 266, ¶ 165 (W.D. Tex.) ("Diagram depicting the members of the 212 PIRU Bloods"). The government apparently did not, however, disclose the police diagram or any pretrial conversations with Sergeant Hunt.

Following Mr. Sparks's resentencing, Mr. Bernard filed a third § 2255 motion to vacate in the Western District of Texas. *See In re Bernard*, 826 F. App'x 356, 358 (5th Cir. 2020) ("*Bernard III*"). The motion argued that the government failed to disclose favorable evidence in violation of *Brady* and presented false testimony at trial in violation of *Napue*. *Id.*; *see Brady v.*

5

*Maryland*, 373 U.S. 83 (1963); *Napue v. Illinois*, 360 U.S. 264 (1959). Rejecting Mr. Bernard's argument that the motion was not successive, the district court dismissed it and transferred it to the Fifth Circuit as an application for leave to file a successive § 2255 motion. *Bernard III*, 826 F. App'x at 258. The Fifth Circuit denied Mr. Bernard leave to file a successive § 2255 motion. *Id.* at 259.

On November 24, 2020, Mr. Bernard filed his § 2241 petition for writ of habeas corpus in this Court raising the same *Brady* and *Napue* claims he had presented in the application for leave to file a successive § 2255 motion to vacate. Dkt. 1. On the same date, he filed a motion to stay execution and motion for evidentiary hearing. Dkts. 2 and 4. The motion to stay execution is now fully briefed.

## II.     Discussion

A motion for stay of execution requires the Court to consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009).

### A.     Likelihood of Success on the Merits

#### 1.     28 U.S.C. § 2255(e)'s Savings Clause

The primary vehicle for a federal prisoner challenging a conviction or sentence is a § 2255 motion to vacate, not a 28 U.S.C. § 2241 habeas corpus petition. Mr. Bernard has already filed three § 2255 motions, and second or successive motions are prohibited absent leave from the appropriate court of appeals pursuant to 28 U.S.C. § 2255(h), so he cannot challenge his conviction or sentence in a habeas corpus petition unless he first shows that § 2255 "is inadequate or

ineffective to test the legality of his detention." 28 U.S.C. § 2255(e); *see Webster v. Daniels*, 784 F.3d 1123, 1135 (7th Cir. 2015) (en banc) (referring to this language as § 2255(e)'s "savings clause"). To satisfy the savings clause, Mr. Bernard must identify "some kind of structural problem" with § 2255 that prevents him from raising his claim in a motion to vacate. *Webster*, 784 F.3d at 1136. A structural problem requires "something more than a lack of success with a section 2255 motion." *Id.*

The Seventh Circuit has identified three types of claims that satisfy the savings clause. *See In re Davenport*, 147 F.3d 605, 610 (7th Cir. 1998) (claim based on a new rule of statutory law made retroactive by the Supreme Court); *Garza v. Lappin*, 253 F.3d 918, 920 (7th Cir. 2001) (claim based on international tribunal's decision issued after § 2255 proceedings had concluded); *Webster*, 784 F.3d at 1139 (claim based on newly discovered evidence, existent but unavailable at the time of trial through the exercise of diligence, showing that petitioner is categorically ineligible for the sentence imposed). As Mr. Bernard rightly notes, these cases do not "'create rigid categories delineating when the safety valve is available.'" Dkt. 13 at 6 (quoting *Purkey v. United States*, 964 F.3d 604, 614 (7th Cir. 2020)).

Mr. Bernard makes a strong showing that *Brady* and *Napue* claims based on newly discovered evidence not available at trial with reasonable diligence may satisfy the savings clause. Indeed, the Seventh Circuit recently suggested as much in *Lee v. Watson*, 2019 WL 6718924, at *1 (7th Cir. Dec. 6, 2019) ("*Lee I*"). The Seventh Circuit held that Mr. Lee could not bring his *Brady* and *Napue* claims in a habeas corpus petition because the purported newly discovered evidence was "available with reasonable diligence" at the time of his trial. *Lee v. Watson*, 964 F.3d 663, 667 (7th Cir. 2020) ("*Lee II*"). This holding suggests that *Brady* and *Napue* claims based on evidence that was *not* available with reasonable diligence may satisfy the savings clause.

7

The government counters that allowing a prisoner to bring a *Brady* or *Napue* claim based on newly discovered evidence in a habeas corpus petition would create an end-run around § 2255(h), which limits a prisoner's ability to bring a successive § 2255 motion based on newly discovered evidence. Dkt. 10 at 18−19; *see* 28 U.S.C. § 2255(h)(1) (allowing successive motions based on "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense"). The government therefore argues that a *Brady or Napue* claim based on newly available evidence can satisfy the savings clause only if the new evidence shows that a petitioner was categorically ineligible for the death sentence. That is, the government argues that *Webster* in fact *does* create a rigid category delineating when the safety valve is available, at least for claims based on newly available evidence. In light of *Purkey*'s admonition to the contrary, the Court rejects this proposed standard. 964 F.3d at 614.

The government is right that allowing any and all *Brady* claims based on newly available evidence would invite an end-run around the § 2255(h)(1) standard. But the structure of § 2255 does provide a limitation for *Brady* and *Napue* claims based on newly discovered evidence. If a prisoner seeks to raise a *Brady* or *Napue* claim attacking his conviction in a successive § 2255 motion, the claim must satisfy § 2255(h)(1)'s heightened standard. As noted above, the structural problem Mr. Bernard faces is that § 2255(h)(1) is not available to him because his *Brady* and *Napue* claims attack his sentence, not his conviction. *See* dkt. 13 at 10 ("[T]he government says that § 2255(h) provides an escape clause for newly discovered evidence—but fails to note that the escape clause doesn't apply where that new evidence relates solely to a petitioner's death sentence. Therein lies a structural problem."). End-run or not, it seems, at a minimum, that the savings clause cannot change the underlying rules regarding successive petitions. Thus, if the savings clause is a

8

remedy for this structural problem, it puts Mr. Bernard in the same position as if he were challenging his conviction—but not in a more advantageous one. *Cf. In re Davenport*, 147 F.3d 605, 611 (7th Cir. 1998) (holding that claim based on new statutory rule made retroactive by the Supreme Court may satisfy the savings clause, applying parallel standard to § 2255(h)(2)).

So, to satisfy the savings clause, Mr. Bernard must rely on newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have imposed the challenged sentence.[2]

Mr. Bernard disagrees, arguing that a § 2255(h)(1)-like standard encourages the government to suppress evidence until initial § 2255 proceedings are complete. Dkt. 16 at 5−7. But Congress was aware of *Brady* when it enacted § 2255 in 1996 through the Antiterrorism and Effective Death Penalty Act. *See Taylor v. Gilkey*, 314 F.3d 832, 836 (7th Cir. 2002). And the implications of § 2255(h) for *Brady* claims based on newly available evidence are apparent upon a moment's reflection. There is no compelling reason to hold such a claim to a lower threshold burden when it attacks a petitioner's sentence instead of the conviction. In any event, the Court believes the result would be the same here, even under a lesser standard.

### 2. Mr. Bernard's Likelihood of Satisfying the Savings Clause

Mr. Bernard has not shown a strong likelihood that he will be able to show, by clear and convincing evidence, or any other standard, that no reasonable juror would have sentenced him to death in light of any newly available evidence.

---

[2] In *Webster*, the Seventh Circuit has left open the question of whether § 2255(h)(1)'s "clear and convincing" standard applies when a prisoner seeks to raise a claim based on newly discovered evidence in a § 2241 petition. 784 F.3d at 1144 ("We . . . do not need to decide whether ['clear and convincing'] is the correct standard, or if a lesser showing would suffice."). But *Webster* is limited to claims relying on newly discovered evidence to show the petitioner is *categorically ineligible* for the death sentence, *id.* at 1140 n.9, a claim Mr. Bernard does not make. For *Brady* and *Napue* claims, the structure of § 2255 seems to compel the heightened standard.

The parties dispute whether any of the evidence Mr. Bernard proffers qualifies as newly available. The government asserts that the student diagram was made available to counsel, citing its inclusion on a pretrial exhibit list. Mr. Bernard disputes that the student diagram was available, but he offers no evidence or even compelling argument. He has therefore failed to show a strong likelihood of success as to this piece of evidence.

As for the police diagram and Sergeant Hunt's conclusions, Mr. Bernard relies on them not being mentioned in trial defense counsel's legal file. The government has not directly asserted that the evidence was disclosed, but they argue that Mr. Bernard has failed to meet his burden of proof that it was not. At this stage, before any evidentiary hearing, the Court resolves this doubt in Mr. Bernard's favor, deeming he has shown a strong likelihood of ultimately proving that this evidence was not available to him through diligence. Likewise, based on Sergeant Hunt's testimony, Mr. Bernard has made a strong showing that the evidence existed at the time of trial. *See* dkt. 3 at 248 (Sergeant Hunt testifying that shortly after the murders, at the government's request, she reviewed the diagrams and identified the placements of Mr. Vialva, Mr. Sparks, Mr. Brown, and Mr. Bernard).

But even supposing that the police diagram and Sergeant Hunt's conclusions are newly available evidence, Mr. Bernard has not made a strong showing that this evidence is so compelling that no reasonable juror would have sentenced him to death in light of it. First, regarding the police diagram, which merely inserted given names for nicknames found in the student diagram, presumably Mr. Bernard did not need the police diagram to inform him by what nickname he went by. This information was already within his ken. Similarly, he did not need either the police diagram or Sergeant Hunt to tell him where he fell in the pecking order of the gang. Regardless, it is common for defendants to argue they were a minor player, and Mr. Bernard was free to do the

10

same during his sentencing phase, despite where he actually fell in the hierarchy. But, evidence of the gang's hierarchy would not have significantly undermined the government's case for a death sentence. To be sure, the government emphasized Mr. Bernard's mere *membership* in the gang. *See*, *e.g.*, *United States v. Bernard*, 6:99-cr-00070-ADA-2, dkt. 317 at 76−77 (W.D. Tex.) (Special Agent Chadwick testifying about Mr. Bernard's involvement in a gang fight). And the government linked Mr. Bernard's gang *membership* to his future dangerousness. *Id.*, dkt. 318 at 238, 244−46. So, the government's arguments did not even rely on the structure—hierarchical or not—of the 212 Piru Bloods, but rather looked forward to what such membership would foretell. The government's prison gang expert testified that if a prisoner "comes into the [prison] system and the Bloods want to recruit him, he has to be the low man on the totem pole." *Id.* at 244. But this lowly status does not make a new inmate less likely to commit violent crime. On the contrary, he must "prey on the weak," "commit assaults," " traffic drugs," and "sanction hits, if necessary, and carry them out" so he can "make bones" and advance within the prison gang. *Id.*

Moreover, the police diagram and Sergeant Hunt's conclusions are easily reconciled with the government's sentencing evidence. Mr. Brown testified that the 212 Piru Bloods founders did not create "any crown holders or any other forms of levels [ ] because it caused too much confrontation . . . . So, everyone was considered equal." *Id.*, dkt. 317 at 98; *see id.* at 113−14 (Ranger Aycock testifying that the gang's founders eschewed titles and hierarchy to prevent intra-gang problems). But the lack of titles and formal hierarchy does not mean there is no informal or loose hierarchy within the gang. Indeed, local law enforcement described Mr. Vialva as an ambitious and influential member of the 212 Piru Bloods. *See*, *e.g.*, *id.* at 114 (Ranger Aycock describing Mr. Vialva as a "climber[ ]" who was "trying to impress" other gang members with his boldness and willingness to commit violence); *id.* at 114−15 (Ranger Aycock testifying that nearly

11

all of the 212 Piru Bloods members whom police interviewed described Mr. Vialva as "scary"); *id.* at 125 (Ranger Aycock testifying that Mr. Vialva had "more brains," that Mr. Brown "was more of a person who would follow," and that Mr. Bernard "was a person who would assist and would not run from a fight").

Perhaps the police diagram and Sergeant Hunt's conclusions would have undermined the prosecutor's suggestion at closing argument that both Mr. Vialva and Mr. Bernard "want to be the top dogs and be the top gangsters." *Id.*, dkt. 319 at 73. But this comment, at least as to Mr. Bernard, was (1) not based on evidence presented at sentencing and (2) not part of a consistent argument. As discussed above, the evidence suggested that Mr. Vialva was ambitious and looking to make a name for himself, but there was no such evidence about Mr. Bernard. And even the government's statement, put into context, is much more accusatory toward Mr. Vialva than Mr. Bernard. *See id.* (asserting that Mr. Vialva wanted "unmistakable proof to other people of his own power over the victims. He wanted complete power, complete control, and he had it, and he was going to show it off. . . . [Mr. Vialva] wanted to be the top gangster in Killeen. You need to recognize him for that. And you need to recognize Brandon Bernard for his assistance in that.").

It does not appear that the sentences recommended by the jury even considered who was the "top gangster" and who was the "assistant." Rather than taking into consideration hierarchy in general, the sentence reflects the actual conduct in this case. Namely, the jury recommended a life sentence for Mr. Bernard where the murder of Mr. Bagley was directly attributable not to Mr. Bernard but to the bullet fired by Mr. Vialva, and the jury recommended a death sentence for Mr. Bernard only where the murder of Mrs. Bagley was attributable, at least in part, to smoke she inhaled from the fire directly set by Mr. Bernard. Mr. Vialva, on the other hand, received death sentences for each of the bullets he directly fired, the bullets accounting for both murders, in whole

or in part. Thus, the jury distinguished between sentences of life or death based on the actual conduct of each defendant rather than on their position in a hierarchy prior to that conduct.

In short, the purported newly available evidence would not have undermined a crucial aspect of the government's case for sentencing Mr. Bernard to death. Nor was the evidence on its own so compelling that, had it been presented at the sentencing, no reasonable juror would have sentenced Mr. Bernard to death. Mr. Bernard therefore has failed to make a strong showing that his *Brady* and *Napue* claims satisfy § 2255(e)'s savings clause, which means he cannot proceed in a § 2241 petition for writ of habeas corpus. *Lee I*, 2019 WL 6718924, at *1. And without showing a strong likelihood of success on the savings clause, Mr. Bernard cannot show a strong likelihood of success on the merits. *Id.* The Court therefore need not address whether Mr. Bernard has shown a strong likelihood of success on the underlying merits of his *Brady* and *Napue* claims.

### B. Irreparable Injury and Public Interest

There is no doubt that Mr. Bernard faces irreparable injury if a stay is denied. The government concedes as much. Dkt. 10 at 29. But both the government and Mr. Bernard's victims "'have an important interest in the timely enforcement of a sentence.'" *Bucklew v. Precythe*, 139 S. Ct. 1112, 1133 (2019) (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)). Because Mr. Bernard has not shown a strong likelihood of success on the merits, the balance of harms here does not warrant a stay.

### III. Conclusion

Mr. Bernard's motion for stay of execution, dkt. [2], is **denied**.

**IT IS SO ORDERED.**

Date: 12/8/2020

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

John Robert Carpenter
FEDERAL PUBLIC DEFENDER
john_carpenter@fd.org

Robert C. Owen
LAW OFFICE OF ROBERT C. OWEN, LLC
robowenlaw@gmail.com

Joseph H. Gay , Jr.
U.S. ATTORNEY'S OFFICE
joseph.gay@usdoj.gov